The UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON, Appellant,

v.

The ESTATE OF Darla BLACKMON, By Its Beneficiary Sheila SHULTZ, and Sheila Shultz, Individually, Appellees.

No. 10-03-00093-CV.

Court of Appeals of Texas, Waco.

June 22, 2005.

Harry Deckard, Asst. Atty. General–Tort Litigation Div., Austin, for appellant.

Stephen A. Khoury, Dallas, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

### Introduction

This is an interlocutory appeal of the trial court's denial of a plea to the jurisdiction by the University of Texas Medical Branch at Galveston (UTMB).

UTMB provides medical services to inmates in Texas Department of Criminal Justice (TDCJ) facilities in Coryell County. An inmate's daughter seeks wrongful-death and survival damages following her mother's death from pneumonia while incarcerated at a TDCJ facility. The issue is whether the plaintiff has alleged a waiver of sovereign immunity from suit under the Texas Tort Claims Act (TTCA) by pleading that the death was proximately caused by negligent use of tangible personal property. TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 2005). Because we conclude that the plaintiff alleged a claim within the statutory waiver, we af-

firm the trial court's denial of the plea to the jurisdiction.

## I.

Plaintiff's Second Amended Original Petition alleged:

In July 2000, Darla Blackmon entered the TDCJ's Substance Abuse Felony Punishment Facility (SAFPF) in Gatesville, Texas for a mandatory stay of approximately nine months for alcoholism treatment. The SAFPF program required Blackmon to remain on site, and Blackmon was dependent on the program for her sustenance and health care needs.

In December 2000, Blackmon became ill with cold/flu symptoms, including cough, respiratory difficulties, nasal discharge, fever, intestinal tract problems, headache, earache, sore throat, hoarseness, nasal stuffiness, and tearing. On January 10, 2001, Blackmon, who was 37 years old, went to the TDCJ/SAFPF medical clinic—operated by UTMB—as an emergency walk-in patient, complaining that the above symptoms had existed for at least four days. The medical records reveal that Blackmon had suffered from similar symptoms for more than a month. Blackmon was seen by Sheila Ringer, a nurse, who administered only cold medications. Blackmon was not referred to a physician, and Ringer did not order diagnostic tests such as a blood test or x-ray. Also, no antibiotics were prescribed or given to Blackmon.

On January 12, 2001, Blackmon requested medical attention again because of her persisting symptoms. She was seen by Donald Baker, a physician's assistant, who performed an office examination and prescribed cold medications and Tylenol. Baker did not refer Blackmon to a physician, nor did he order diagnostic tests or prescribe antibiotics.

Because of her persisting and worsening symptoms, Blackmon sought additional medical attention on January 13, 2001 at 11:30 a.m. She was seen by Bonnie Roach, a nurse, who performed an office examination using a thermometer and a stethoscope. Roach recorded a temperature of 103.5 degrees for Blackmon but did not refer Blackmon to a physician, order diagnostic tests, or prescribe antibiotics.

Blackmon's symptoms became acute and she experienced a significant inability to breathe, and she again sought medical attention on January 13, 2001 at 11:00 p.m. On this occasion, she was seen by John Lancaster, a nurse, who performed an office examination. In his examination, Lancaster used: a pulse oxymeter, which is used to determine oxygen saturation in the lungs; a stethoscope, which is used to detect adverse lung sounds; and a thermometer, which is used to detect fever. Lancaster dispensed cold medications and Tylenol but did not refer Blackmon to a physician, nor did he order diagnostic tests or prescribe antibiotics for Blackmon.

Blackmon was ordered back to her room, and upon returning, her symptoms became even more severe, as her inability to breathe caused her face and skin to turn blue. Crying and hysterical, she begged TDCJ guards for medical attention, but her pleas were refused. Other inmates who knew of Blackmon's condition began requesting—sometimes shouting—at the guards for medical attention for Blackmon, but the guards ordered these and other inmates who were attempting to help Blackmon to leave her alone and to return to their rooms.

The following morning, January 14, 2002, at approximately 10:00 a.m., Blackmon died in her dorm room by asphyxiation. A UTMB physician performed an autopsy and found bacterial pneumonia to be the cause of Blackmon's death.

## II.

Plaintiff Sheila Shultz, Blackmon's daughter, individually and on behalf of Blackmon's estate, brought a negligence action to recover for wrongful-death and survival damages against the following: UTMB, Baker, Roach, Lancaster, Ringer, and James M. West, M.D. UTMB filed a plea to the jurisdiction, asserting that Shultz's claims did not satisfy the TTCA's use-of-property requirement. The trial court denied UTMB's plea to the jurisdiction.

In one issue, UTMB asserts that Shultz did not adequately plead or show that the use of tangible property proximately caused Blackmon's death and that the trial court erred in denying its plea to the jurisdiction. We will overrule the issue and affirm the trial court's order.

## III.

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of the action. *Texas Dep't Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999). Whether the trial court has subject matter jurisdiction is a question of law that we review de novo. *Texas Natural Resource Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002). The plaintiff has the burden of alleging facts that affirmatively establish the trial court's subject matter jurisdiction. *Texas Ass'n Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). In determining whether jurisdiction exists, we accept the allegations in the pleadings as true and construe them liberally in favor of the plaintiff. *Texas Dep't Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex.2004); *Texas Ass'n Bus.*, 852 S.W.2d at 446.

The TTCA provides a limited waiver of sovereign immunity and allows suits

against governmental units only in certain narrow circumstances. *Texas Dep't Crim. Justice v. Miller,* 51 S.W.3d 583, 587 (Tex. 2001). We look to the terms of the TTCA to determine the scope of waiver and then consider the particular facts of the case before us to determine whether the case comes within that scope. *Id.; Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 584 (Tex.1996).

The specific TTCA provision under which Shultz alleges waiver provides that "[a] governmental unit in the state is liable for ... personal injury and death so caused by a condition or use of tangible personal property or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(2).

We turn to an examination of Shultz's pleadings to decide whether she asserts a claim for which sovereign immunity has been waived. *Miller,* 51 S.W.3d at 587; *Jones,* 8 S.W.3d at 639.

### IV.

In her petition, Shultz alleges that Nurse Roach failed to properly use or misused a diagnostic medical tool—a stethoscope—in assessing Blackmon's condition, that she negligently interpreted the medical data or information reflected by the stethoscope, that had she properly used the stethoscope, she would have detected Blackmon's severe pneumonia, and had pneumonia been detected, Blackmon's life could have been saved. Shultz also alleges that Nurse Lancaster failed to properly use or misused diagnostic medical tools—a stethoscope to detect adverse lung sounds and a pulse oxymeter to determine oxygen saturation in the lungs—in assessing Blackmon's condition, that he negligently read or interpreted the medical data or information reflected by the stethoscope and pulse oxymeter, that had he not negligently used the stethoscope and pulse oxymeter but had correctly used them, he would have detected Blackmon's severe oxygen deprivation and life-threatening lung sounds and her advanced pneumonia, and Blackmon's life could have been saved.

### A.

██ Texas courts have struggled for over two decades with the TTCA's use-of-property requirement. *See Miller,* 51 S.W.3d at 589; *id.* at 589–91 (Hecht, J., concurring); *id.* at 593–95 (Enoch, J., dissenting); *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 343 (Tex.1998) ("The requirement of causation is more than mere involvement, although exactly how much more has been difficult for the courts to define."); *University of Tex. Med. Branch v. York,* 871 S.W.2d 175, 177 (Tex.1994) (referring to the courts' "long and arduous history" in construing section 101.021(2)). For the "use" of tangible personal property to occur, the actor must put or bring the property into action or service, or employ the property for or apply it to a given purpose. *Miller,* 51 S.W.3d at 588. Because health care providers in state medical facilities use tangible personal property nearly every time they treat a patient, the use alone of the property is insufficient to establish a waiver of sovereign immunity. *Id.; Clark,* 923 S.W.2d at 585–86. The property must do more than furnish the condition that makes the injury or death possible, and the use or condition of the property must not be too attenuated geographically, temporally, and causally from the injury or death. *Bossley,* 968 S.W.2d at 343. The personal injury or death must be proximately caused by the use of tangible property. TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(2); *Bossley,* 968 S.W.2d at 343.

The use-of-property causation requirement "is more than mere involvement." *Bossley*, 968 S.W.2d at 343. Using the property must have "actually caused" the injury. *Miller*, 51 S.W.3d at 588 (citing *Texas Natural Resource & Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex.2001)). The supreme court's use of the phrase "actually caused" in *White* was in the context of its rejection of a claim based on the failure to use property (non-use): "the equipment's use must have actually caused the injury." *White*, 46 S.W.3d at 869 (citing *Bossley*, 968 S.W.2d at 342–43). The injury must be caused by actual use of the property, not by the failure to use it. *Id.* The court in *White* did not expressly or implicitly abandon the TTCA's proximate-cause requirement for a different standard such as immediate cause, direct cause, or sole cause. *See Michael v. Travis County Housing Auth.*, 995 S.W.2d 909, 912 (Tex.App.-Austin 1999, no pet.) ("The supreme court has consistently construed the causation requirement in section 101.021(2) to be one of *proximate* cause, not a different standard such as immediate cause, direct cause, or sole cause....."). *White* in turn cited *Bossley*, which discussed and applied proximate cause.[1] *Bossley*, 968 S.W.2d at 342–43.

The court's most recent iteration of "actually caused" occurred in *Dallas Area Rapid Transit v. Whitley*, a case involving a city bus and a passenger who was assaulted by third parties after the driver told him to get off the bus after a disturbance caused by another passenger. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540 (Tex.2003). In finding that the plaintiff's injuries did not arise from the use of the bus, but rather from the driver's failure to supervise the public, the court noted that it has consistently required a nexus between the operation or use of a motor-driven vehicle or equipment and a plaintiff's injuries. *Id.* at 542–43. Quoting *White*, the court stated that " 'the [vehicle]'s use must have actually caused the injury.' " *Id.* at 543 (quoting *White*, 46 S.W.3d at 869). The court concluded that, "as with the condition or use of property, the operation or use of a motor vehicle 'does not cause injury if it does no more than furnish the condition that makes injury possible.' " *Id.* (quoting *Bossley*, 968 S.W.2d at 343).

### B.

In *Salcedo v. El Paso Hospital District*, the plaintiff's husband went to the hospital's emergency room with chest pain and was given an examination, including an electrocardiogram. *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30 (Tex.1983). The electrocardiogram charts showed a classic pattern for a heart attack, but the physician who read the chart failed to recognize the pattern and sent the patient home. Shortly after returning home, the patient suffered a heart attack and died. The supreme court held that the plaintiff's allegation that her husband's death was proximately caused by the negligent use (misuse) of the electrocardiogram—the improper reading and interpreting of the electrocardiogram charts—alleged a use of tangible personal property and stated a cause of action under the TTCA. *Id.* at 33. Reading and interpreting are purposes for

---

1. The traditional elements of proximate cause are cause in fact and foreseeability. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Cause in fact means that the act or omission was a substantial factor in bringing about the injury or death and, without it, harm would not have occurred. *Id.* Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his or her negligent act created for others. *Id.*

which an electrocardiogram chart is used or employed in diagnosing heart attack. *Id.*

The supreme court has stated that *Salcedo* is limited to its facts. *Bossley,* 968 S.W.2d at 342 (citing *York,* 871 S.W.2d at 178).[2] The *Bossley* court's discussion of *Salcedo* centered on the Dallas Court of Appeals' misunderstanding and misapplication of *Salcedo:* "The court of appeals in this case took our comment in *Salcedo* to mean that for immunity to be waived, 'the property ... does not have to be the instrumentality of harm, it need only be involved.'" *Id.* (quoting *Bossley v. Dallas County Mental Health and Mental Retardation,* 934 S.W.2d 689, 695 (Tex.App.-Dallas 1995), *rev'd,* 968 S.W.2d 339, 343 (Tex.1998)). In reversing the court of appeals, the critical emphasis of the supreme court in *Bossley* was on the court of appeals' conclusion that "some involvement of property" was all that was required for sovereign immunity to be waived. *Id.* at 342–43. The supreme court then engaged in a proximate cause analysis and found that the property at issue—unlocked doors in a county mental health facility through which a patient escaped and killed himself on a freeway by leaping in front of a truck—were too attenuated from the patient's death to have caused it. *Id.* The supreme court never said that the unlocked doors had to have been the actual instrumentality of harm.[3] *See id.*

*Salcedo* thus remains authoritative in TTCA cases involving allegations of negligent use (misuse) of diagnostic medical equipment; it has not been overruled and continues to be cited by the supreme court

and courts of appeals. *See Miller,* 51 S.W.3d at 589; *id.* at 589–90 (Hecht, J., concurring); *Anderson v. City of San Antonio,* 120 S.W.3d 5, 9–10 (Tex.App.-San Antonio 2003, pet. denied) (Marion, J., concurring); *Baston v. City of Port Isabel,* 49 S.W.3d 425, 428–29 (Tex.App.-Corpus Christi 2001, pet. denied); *University of Tex. Med. Branch v. Hardy,* 2 S.W.3d 607, 609–10 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

In *Hardy,* the patient was in the state hospital's cardiothoracic care unit and was connected to a cardiac monitor that was intended to monitor her heart's activity and to signal an alarm if any problems occurred. When the cardiac monitor sounded an alarm because of complete heart blockage and heart stoppage, resuscitation efforts did not begin for at least five minutes. While the patient was revived, she suffered severe brain damage and later died. The plaintiff alleged that the hospital employees did not properly oversee the cardiac monitor. In the appeal of the trial court's denial of the state hospital's plea to the jurisdiction, the appellate court, relying on *Salcedo,* held that the plaintiff's allegation of negligence in failing to properly monitor the cardiac monitor was a use of tangible personal property and thus there was a waiver of sovereign immunity under the TTCA:

In the present case, the use of the cardiac monitor directly affected the decedent by monitoring her heart's activity, and served as an early warning device in case of a problem. The cardiac monitor could only be effective, however, if it was properly monitored at all times.

---

2. In *York,* the court noted that the waiver of immunity in *Salcedo* arose from the governmental unit's *misuse* of the electrocardiogram. *York,* 871 S.W.2d at 178; *see Bossley,* 968 S.W.2d at 342.

3. In his dissent, Justice Abbott noted, "While it is true that the doors did not injure Bossley by actually physically striking him, that is not the test. The test is simply whether the doors were a proximate cause of Bossley's injury." *Id.* at 345 (Abbott, J., dissenting).

Unfortunately, the person responsible for monitoring the cardiac monitor failed to do so, resulting in the death of the decedent from the very condition that the proper use of the cardiac monitor was intended to avoid.

We find no significant distinctions between the facts before us and the facts of *Salcedo* insofar as the tangible personal property at issue is concerned. The electrocardiogram in *Salcedo* and the cardiac monitor here were "put into action or service" and "employed for a given purpose." There is little doubt that the hospital's decision to put the cardiac monitor into service for the purpose of monitoring the decedent's heart, and the hospital employee's subsequent failure to pay proper attention to the monitor, constitute a use or misuse, of tangible personal property. Furthermore, the relationship between the alleged negligence of the employee and the death of the decedent is in no way attenuated, or weak but rather, is contemporaneous and directly connected.

*Hardy,* 2 S.W.3d at 610. The supreme court denied UTMB's petition for review in *Hardy.*

In *Baston,* Port Isabel EMTs responded to an emergency assistance call for the decedent. When the EMTs arrived, they used an EKG monitor to determine if the decedent was experiencing cardiac problems. The plaintiffs alleged that the EMTs misinterpreted the reading of the EKG machine, reading the results as normal when the machine actually indicated the decedent was suffering from cardiac problems. Not having been transported to the hospital, the decedent died later that morning. Port Isabel filed a plea to the jurisdiction, claiming sovereign immunity barred the suit, and the trial court granted the plea. *Baston,* 49 S.W.3d at 427.

On appeal, the plaintiffs argued that under *Salcedo,* the misuse of an EKG machine qualifies as a misuse of tangible personal property. *Id.* at 428. In response, Port Isabel argued that *Salcedo* could no longer be relied upon in light of the *Bossley* court's limitation of *Salcedo* to its facts. The court of appeals rejected Port Isabel's argument, noting that the *Bossley* court did not address the question of whether an EKG machine or its graphs would constitute tangible personal property. *Id.* The court concluded that *Salcedo* was still a viable statement of the law and that its facts were sufficiently analogous to apply it. *Id.* at 428–29. The court thus held that the plaintiffs' allegations of negligent use or misuse of an EKG machine stated a claim under the TTCA. *Id.* at 429–30. The supreme court denied Port Isabel's petition for review in *Baston.*

### C.

Relying on *Anderson v. City of San Antonio,* UTMB's principal argument in this appeal is that the supreme court in *Whitley* and *Bossley* effectively overruled *Salcedo* and its progeny such as *Baston. See Anderson v. City of San Antonio,* 120 S.W.3d 5 (Tex.App.-San Antonio 2003, pet. denied). *Anderson* directly contradicts *Salcedo, Hardy,* and *Baston.* In Anderson, city EMTs were called to the residence of the decedent, who was experiencing severe chest pain and left-arm numbness. The EMTs performed two EKG tests, using an EKG machine, and determined that the decedent did not need to be taken to the hospital. Later the same day, the decedent again had chest pain, and his family called for EMT assistance. This time he was taken to the hospital, but he died later that night. The plaintiffs alleged that the EMTs negligently interpreted the EKG. *Id.* at 6. On appeal of the trial court's dismissal on sovereign immunity, the San Antonio

court acknowledged *Salcedo* and *Baston* but asserted that because of *Whitley*, *Salcedo* was no longer controlling. In its application of *Whitley*, the court stated:

> Applying the law to the facts, the court [in *Whitley* ] noted that the plaintiff's injuries were not caused by the use of the bus; they were caused by the woman and her recruits. *Id.* [citing *Whitley*, 104 S.W.3d at 542–43]. While the bus driver's failure to supervise the woman may have contributed to the plaintiff's injuries, the use of the bus did not. *Id.*
>
> Similarly, here, Richard Anderson's death was caused by his cardiac condition and the EMTs' alleged negligence. It was not, however, caused by use of the EKG machine, itself. In light of *Whitley*, we no longer believe that *Salcedo* is controlling. We, therefore, hold that sovereign immunity bars the plaintiffs' suit, thereby depriving the trial court of subject matter jurisdiction.

*Anderson*, 120 S.W.3d at 9.

We disagree with *Anderson's* analysis and application of *Whitley*.[4] In *Whitley*, the supreme court actually stated: "We agree that *Whitley's* injuries did not arise from the use of the bus. Rather, his injuries arose from the bus driver's *failure to supervise the public*, which is insufficient to waive immunity under the Tort Claims Act." *Whitley*, 104 S.W.3d at 542–43 (emphasis added). "The gravamen of Whitley's complaint is that [the assailants'] actions and *the bus driver's failure to supervise the public* caused his injuries." *Id.* at 543 (emphasis added). It was the lack of a nexus between the *use* of the bus and Whitley's injuries that was key; the bus driver's negligence was in his failure to supervise the public, not in how he was using the bus. *See id.* And the supreme court never said that the bus itself had to physically injure Whitley.[5]

As the Austin court has stated, *Bossley* does not require that the property directly inflict the injury or death, but only that a reasonably close causal relationship exists between the use or misuse of the property and the resulting injury or death. *See Michael*, 995 S.W.2d at 913 (citing *Bossley*, 968 S.W.2d at 343). In *Michael*, the Austin Court of Appeals expressly disagreed with

**4.** In a concurring opinion in *Anderson*, Justice Marion disagreed with the majority's treatment of *Salcedo*:

> Because the majority holds that the Texas Supreme Court's decision in *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983) is no longer controlling case law, I disagree and write separately. We are bound to follow *Salcedo* unless the Texas Supreme Court overrules it. Although having had ample opportunity to do so, the Supreme Court has not overruled its holding in *Salcedo*. *See University of Texas Med. Branch at Galveston v. York*, 871 S.W.2d 175, 178 (Tex.1994); *Dallas County Mental Health v. Bossley*, 968 S.W.2d 339, 342 (Tex.1998); *see also Texas Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 595 (Tex. 2001) (Enoch, J., dissenting). With the exception that the alleged actions in *Salcedo* occurred in a hospital setting rather than in a setting involving EMTs, the facts in *Salcedo* are virtually the same facts as in this

> case. Therefore, I would apply *Salcedo's* holding here and hold that the EMTs' use of the EKG machine was the use of tangible personal property and, therefore, immunity is waived. *See Salcedo*, 659 S.W.2d at 33. *Anderson*, 120 S.W.3d at 9–10 (Marion, J., concurring). But because the EMTs were immune under a TTCA waiver exception found in section 101.062 for EMTs responding to a 9–1–1 emergency call, she would have affirmed the trial court's dismissal on that basis. *Id.* at 10 (Marion, J., concurring).

**5.** Suppose instead that, immediately after Whitley got off the bus, the bus driver ran a red light, causing a car to swerve to miss the bus, but in doing so, the car hit and injured Whitley. Under *Anderson*, because the bus didn't hit Whitley, he would not have a claim under the TTCA. Surely the use of the bus in running the red light would be a cause of Whitley's injury.

another San Antonio court decision: "*Koehler* interpreted *Bossley* to require that a premise condition 'must actually be the instrumentality that causes the plaintiff's harm.'" *Id.* at 915 (quoting *San Antonio State Hosp. v. Koehler*, 981 S.W.2d 32, 37 (Tex.App.-San Antonio 1998, pet. denied)). The Austin court failed to find such a "sweeping conclusion" in *Bossley*, contesting the *Koehler* court's perception that *Bossley* adopted what the Austin court called such an "extreme standard." *Id.*

■ We agree with *Michael*; we do not believe that the supreme court—without telling us so, despite many opportunities—has, in *Bossley*, *White*, *Miller*, and *Whitley*, fashioned a new rule of law in TTCA cases that the property itself must be the actual instrument that physically caused the harm. *See id.*, 995 S.W.2d at 913–15. We believe that the San Antonio court in *Koehler* and *Anderson* misapplied *Bossley* and *Whitley*. The supreme court's causation discussions in those cases explained that the TTCA's use-of-property requirement calls for "more than mere involvement" of property and more than furnishing the condition that makes the injury possible. *Whitley*, 104 S.W.3d at 543; *Bossley*, 968 S.W.2d at 342–43. The supreme court requires only a causal nexus between the use of property and a plaintiff's injury. *Whitley*, 104 S.W.3d at 543. It has never stated that the property—rather than the use of the property—must be the actual instrument of harm. We will adhere to what the supreme court has actually said: the *use or misuse* of the property—not the property itself—must have caused the injury or death. *See id.* ("the [vehicle]'s *use* must have actually caused the injury"); *Miller*, 51 S.W.3d at 588 ("*Using* that property must have actually caused the injury."); *White*, 46 S.W.3d at 869 ("the equipment's *use* must have

actually caused the injury.") (emphases added).

**D.**

■ Undoubtedly, Blackmon physically died from severe pneumonia; neither the stethoscopes nor the pulse oxymeter used by the UTMB nurses were the actual physical instruments that killed Blackmon. Resolving this case by finding that Blackmon's death was "actually caused" by pneumonia and ending the inquiry is, until the supreme court expressly says otherwise, in our view too simplistic for our TTCA jurisprudence and departs from longstanding precedent on the use-of-property requirement in cases involving the misuse of diagnostic medical equipment. That Blackmon's immediate and direct cause of death was untreated pneumonia does not foreclose the alleged negligent *use* or *misuse* of a stethoscope and pulse oxymeter from being a proximate cause of her death under the TTCA.

Shultz alleges that nine hours before Blackmon's asphyxial death from severe pneumonia, Nurse Lancaster—the last UTMB health care provider to see Blackmon before her death—misused a stethoscope in assessing Blackmon's condition, that had he properly used the stethoscope, he would have detected Blackmon's severe and life-threatening lung sounds and pneumonia, and had pneumonia been detected, Blackmon's life could have been saved. Shultz also alleges that on the same occasion, Nurse Lancaster misused a pulse oxymeter to determine oxygen saturation in Blackmon's lungs, that had he correctly used the pulse oxymeter, he would have detected Blackmon's severe oxygen deprivation and her advanced pneumonia, and Blackmon's life could have been saved.

The stethoscope and pulse oxymeter were tangible personal property whose purposes were to assist in an assessment

of Blackmon's lung functioning. Shultz adequately alleges the misuse of the stethoscope and pulse oxymeter on Blackmon: had these tools been properly used, Blackmon's severe pneumonia would have been detected and she would have received lifesaving treatment, rather than being sent to her dorm room with untreated pneumonia to face death by asphyxiation.

*Miller* does not compel a different conclusion, as it is readily distinguishable. There the supreme court held that the alleged misuse of medication for severe headaches and nausea that masked the symptoms of the patient's diagnosable meningitis, which was thus misdiagnosed and left untreated, did not cause his death. *Miller*, 51 S.W.3d at 587–88. The court found that neither the drugs nor the treatment given to the patient "hurt him or made him worse, in and of themselves." The alleged error in medical judgment in the misdiagnosis of his meningitis and the passage of time was only an allegation of negligence, not the "use" of tangible property that "caused" injury. *Id.* at 588.

Focusing on the alleged misuse of the pulse oxymeter, Shultz distinguishes *Miller* in several respects: *Miller* was a misdiagnosis case, and the medications allegedly misused were not given diagnostically; they were given to treat symptoms, and there is no indication in *Miller* that, had the medications been properly used, the patient would not have died. By contrast, in this case, the very purpose of the pulse oxymeter allegedly misused by Lancaster was to evaluate Blackmon's oxygen saturation in her lungs, and because it was allegedly misused nine hours before her death, Blackmon's pneumonia was not detected and treated emergently. According to Shultz, had Lancaster used the pulse oxymeter properly, he would have ob-

tained critical lung oxygenation values nine hours before Blackmon's death. The alleged misuse of the medications in *Miller* did not harm the patient; but for the alleged misuse of the pulse oxymeter, Blackmon's pneumonia would have been detected and she would not have died.

In *Miller* the medications were a mere involvement; here, the pulse oxymeter's misuse is alleged as a cause in fact: but for the alleged misuse of this property, she would not have died. Blackmon's death was the very result that the proper use of the pulse oxymeter was specifically intended to avoid. *See Hardy*, 2 S.W.3d at 610. In *Miller* there was an alleged error in medical judgment; here, there was not an error in judgment, but misuse of a pulse oxymeter that failed to detect Blackmon's fatally low oxygenation.

Unlike *Miller*, the pleadings meet the traditional elements of proximate cause. Shultz alleges that the misuse of the pulse oxymeter was a substantial factor in bringing about Blackmon's death, and but for the misuse, Blackmon would not have died. And her death by asphyxia caused by lack of oxygenation was an anticipated and foreseeable event, given the purpose for using a pulse oxymeter and particularly in light of Blackmon's complaints of significant breathing difficulty.

We hold that Shultz has adequately pled that the misuse of the stethoscope and pulse oxymeter by a UTMB nurse actually caused—and was a proximate cause of—Blackmon's death. A sufficient nexus exists between the alleged negligence in the misuse of the stethoscope and pulse oxymeter and Blackmon's death under a traditional proximate-cause analysis, and the alleged misuse, which occurred nine hours before Blackmon's death, is neither too attenuated temporally nor too weak caus-

ally.[6] *See Salcedo*, 659 S.W.2d at 33; *Baston*, 49 S.W.3d at 428–29; *Hardy*, 2 S.W.3d at 609–10.

Because the TTCA's use-of-property requirement is met, the trial court properly denied UTMB's plea to the jurisdiction.

## Conclusion

We overrule UTMB's sole issue and affirm the trial court's denial of UTMB's plea to the jurisdiction.

Chief Justice GRAY dissents.

TOM GRAY, Chief Justice, dissenting.

The interlocutory appeal has become moot because the plaintiff, appellee, has dismissed their claims against the defendant, appellant. U.T. takes the position that the general rule that a dismissal can be taken at any time is superseded by the statute that an interlocutory appeal stays all trial court proceedings. TEX. CIV. PRAC. & REM. CODE ANN § 51.014(b) (Vernon Supp. 2004–05). Appellee responds that U.T. is relying on the current statute and this appeal was brought under the former statute that provided that only the commencement of the trial was stayed by an interlocutory appeal. Act of 1985, 69th Leg., ch. 959, § 1, *amended by* Act. of 2003, 78th Leg., ch. 204, § 1.03 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(b) (Vernon Supp. 2004–05)). If we have to rely on the statute, appellee is correct, and U.T. is wrong.

But the issue here is much broader than whether the interlocutory appeal can stay all proceedings in the trial court or just the commencement of a trial date. It is questionable whether the filing of a notice of non–suit is even a "proceeding" within the meaning of the statute. A notice of non–suit is just that—a notice. Once filed, the plaintiff no longer has a claim pending against U.T. Without an underlying claim against the appellant, there is nothing to appeal. There is no case–in–controversy. We have lost jurisdiction because the merits of the appeal are moot. "When a cause becomes moot on appeal, all previous orders and judgments should be set aside and the cause, not merely the appeal, dismissed." *Freeman v. Burrows*, 141 Tex. 318, 171 S.W.2d 863 (1943); *see also Barnett v. Conroe Independent School Dist.*, 455 S.W.2d 376, 381 (Tex.Civ.App.-Beaumont 1970, no writ).

The majority opinion is nothing more than an advisory opinion. We have no jurisdiction to issue advisory opinions. *Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641 (1933). Further, the majority has it exactly backwards. The correct ruling is that the motion to dismiss is granted because the appeal is moot, and anything we say on the merits of the issue as originally presented is irrelevant.

Because the majority fails to dismiss the appeal and issues a purely advisory opinion, I dissent.[1]

---

6. We make no judgment on the merits of the case or on the anticipated evidence—those determinations are for the factfinder. *See Hardy*, 2 S.W.3d at 610.

1. In the past we have had so few opinions withdrawn that no particular problems were created if the opinions were withdrawn by an order separate from the new opinions being issued. The problem is that over the past year we have withdrawn numerous opinions, with and without motions for rehearing, and when on motion for rehearing, with and without requesting responses. Issuing multiple opinions in the same appeal creates confusion. A person can hold in their hands two

opinions from this Court, both certified by the clerk as authentic, which are not the same. Our past practice has been that the latter normally does not reference the existence of the earlier opinion that is being withdrawn.

Our past practice did not present a problem when the issuance of another opinion in the same case was rarely done. At least the problem was manageable. But due to the greatly increased frequency of the majority issuing multiple opinions, I thought it was an appropriate time to adopt the procedure utilized by the Texas Supreme Court; to include the order, and explanation if needed, withdrawing the prior opinion as the first paragraph of the new opinion. *See e.g., Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 381 (Tex. 2000).

This is a simple procedure for the convenience of anyone reading the opinions to understand, and easily determine which opinion is the Court's final opinion. This process also allows a researcher, interested in the ultimate disposition, to easily track backwards, if necessary, to see the development of the final opinion. Because the majority refuses to provide that information in its opinion, I do so in this dissenting opinion.

The Court's opinion affirming the trial court's judgment, the judgment, and Justice Vance's dissenting note, all dated October 13, 2004, were withdrawn by a divided court on April 27, 2005 in a written order, from which Chief Justice Gray dissented because a new opinion did not simultaneously replace the earlier one. The Court's opinion, Chief Justice Gray's dissenting opinion, and the judgment of this date are substituted in place of the opinion and judgment issued on October 13, 2004.