**TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER, Appellant,**

v.

**Rickey LUCERO and Larry Lucero, Survivors and Heirs at Law of Patricia Lucero, Decedent, and The Estate of Patricia Lucero, Appellees.**

No. 08–05–00297–CV.

Court of Appeals of Texas,
El Paso.

Aug. 2, 2007.

Rehearing Overruled Sept. 5, 2007.

---

**10.** Jones does not argue his counsel rendered ineffective assistance.

Elsa Nava, Office of the Attorney General, Tort Litigation Division, Austin, for appellant.

Heather A. Ronconi, El Paso, for appellees.

Before CHEW, C.J., McCLURE, and CARR, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

This is a medical malpractice case filed against a governmental entity pursuant to the Texas Tort Claims Act (the Act). Texas Tech University Health Sciences Center (Tech) appeals from a judgment rendered in favor of Rickey Lucero and Larry Lucero, Survivors and Heirs at Law of Patricia Lucero, Decedent, and the Estate of Patricia Lucero (Lucero). We affirm.

### FACTUAL SUMMARY

On January 22, 2001, seventy-eight-year-old Patricia Lucero underwent laproscopic removal of her gallbladder. A Tech physician, Dr. Emmett McGuire, performed the surgery. The procedure was successful and Lucero was discharged from the hospital the following day. She had follow-up visits at Tech in February and March. At the March visit, she complained of abdominal pain. A liver function test showed an elevated level of alkaline phosphatase which can indicate inflammation in the bile duct. On May 11, Lucero telephoned Tech and complained of intermittent pain radiating from the epigastric area to the left side

of the chest. A resident physician, Dr. Hyo–Rang Lee, wrote on the chart that a chest x-ray, EKG, and a basic metabolic panel with CBC should be performed, with Lucero receiving the next available appointment thereafter. Dr. Lee did not order the tests and there is no indication that the nursing staff contacted Lucero. Lucero saw Dr. McGuire on May 16 and he noted her complaint about pain on the left side. According to Dr. McGuire, her complaints were not consistent with a bile leak or stricture.

Lucero returned to Tech on June 5 for another follow-up visit. She saw Dr. Lee and described pain in the upper left quadrant of her abdomen, as well as back pain and tingling in her left hand. Dr. Lee ordered a CT scan and liver function lab work, but these tests were not performed until August 16.

Meanwhile, Lucero went to the La Fe Clinic on July 12 and the staff sent her to R.E. Thomason Hospital's emergency room because she was jaundiced. Lucero was admitted and a consult was obtained from Dr. Saket Prasad, a Tech gastroenterologist. Lucero's liver function tests were markedly abnormal with elevated levels of bilirubin, alkaline phosphatase, AST and ALT, indicating an obstruction in the bile duct. On July 13, Dr. Prasad performed an endoscopic retrograde cholangiopancreatography (ERCP), which is a procedure to visualize the bile duct. Dr. Prasad diagnosed a common hepatic duct stricture or narrowing of the bile duct.[1] He placed a stent in the bile duct to open the stricture and allow bile to drain past the stricture. Lucero was discharged from Thomason on July 14.

During a telephone call to Dr. Prasad on July 30, Lucero complained of back pain.

Dr. Prasad did not believe the pain was related to the ERCP procedure. On August 9, Lucero returned to Tech, but she did not see Dr. Prasad. The notes from that visit reflect that Lucero was continuing to experience pain. Lucero saw Dr. Lee again in August. Following the visit, Lucero wrote a letter complaining of Dr. Lee's comments:

> To Whom it May Concern: I would like to request that a new doctor be assigned to me, because Dr. Lee (female) failed to understand the medical complaints I went to see her for and did not address them as valid. She began asking myself and my daughter (who always accompanies me at my clinic visits) if we had boyfriends, and further stating that we needed to spend time apart from each other and that we should see other people, which was most inappropriate. Insinuating that because my daughter inquires how I'm feeling that it was somehow causing me to have psychosomatic symtoms [sic] of a hypochondriac. On July 12, 2001 I went to La Fe clinic because (I was not getting the attention I was seeking from Dr. McGuire or Dr. Lee at Texas Tech) I was seriously jaundiced and was sent back to Thomason emergency by the doctor at La Fe Clinic, later that evening I was hospitalized after which I underwent an endoscopy procedure to insert a stent because I was found to have a stricture of my bile duct.

A CT scan was performed on August 16 and the radiologist concluded there was decreased attenuation around the porta hepatis, suggesting a tumor. Dr. Prasad reviewed the film with the radiologist and disagreed with that finding. He believed

---

1. Dr. McGuire testified that this stricture could have resulted from the January gallbladder surgery.

that the irregular attenuation was unrelated to the bile duct stricture. Lab tests revealed that Lucero's liver function tests had almost completely normalized. Dr. Prasad did not see Lucero again until September 4. His notes reflect that Lucero complained of diffuse body ache and mild abdominal pain, and her alkaline phosphatase reading was markedly high. His impression was that there was a biliary stricture in the common bile duct. He planned to perform another ERCP on October 11. However, Lucero's daughter, Kathy, called on September 11 and asked whether the ERCP could be moved to an earlier date because her mother was experiencing abdominal cramps and back pain. Dr. Prasad did not reschedule because he believed that Lucero's pain was possibly related to osteoporosis. When Kathy called him again and asked whether he minded if Lucero saw another doctor, he did not object.

Dr. Jesus Hernandez, a gastroenterologist, first examined Lucero on September 20. He initially concluded that there was a bile duct stricture but he believed she was stable. However, he admitted her to Providence Hospital that evening after she called to report fever and chills. Because she had a stent in the bile duct, he thought it possible that the stent was clogged and she might have an infection. When he performed an ERCP, he discovered that the stent was occluded and had migrated from where it had been placed by Dr. Prasad. Although stents commonly migrate, this case was unusual because the stent had migrated through the wall of the bile duct, causing a tear in the bile duct and a bile leak. He removed the existing stent and placed one in the right side of the bile duct. He was unable to place a stent in the left side due to the tear.

Following the ERCP, Dr. Hernandez went to Thomason Hospital to review the films. He concluded from the August 16 CT scan that the stent was not in the intrahepatic biliary system. He talked to Dr. Prasad, advising him of the ERCP results and his review of the August 16 CT scan. He told Dr. Prasad that the stent had migrated, that it was poking through the bile duct wall, and that there was a bile leak. Dr. Prasad responded, "Well, that's that." Lucero's condition continued to deteriorate and on September 25, Dr. Hernandez again tried, albeit unsuccessfully, to place a stent on the left side. He concluded that Lucero required a major biliary reconstruction procedure and referred her to Baylor Medical Center. Lucero was transferred to Baylor but the doctors were unable to repair her bile duct. She was returned to El Paso, developed sepsis, and died on December 20.

Dr. Hernandez testified that the bile duct stricture and bile leak led to a bacterial infection in the biliary system which spread into the liver. Because the infection could not be cleared, Lucero developed sepsis and died as a result. Dr. Hernandez believed that Dr. Prasad had correctly placed the stent. But since the August 16 CT scan revealed that the stent had migrated, it should have been removed and the nature of the problem investigated further. According to Dr. Hernandez, Dr. Prasad breached the standard of care by failing to take these actions.

Another expert witness, Dr. Mazen Jamal, testified that Dr. Prasad should have diagnosed the bile leak on August 16. In his opinion, Lucero probably had an infection at that time. If Dr. Prasad had treated it properly in August and September, Lucero would not have developed the liver abscesses and liver failure which led to her death.

On May 14, 2002, Tech received a letter from an attorney representing the Lucero plaintiffs alleging "negligent performance

of gallbladder surgery on January 22, 2001 and negligent post-operative care that was the proximate cause of Mrs. Lucero's death on December 20, 2001." The plaintiffs filed suit on August 29, 2003, alleging medical malpractice and misuse of property under the Texas Tort Claims Act. A jury found that Tech's negligence proximately caused Lucero's death and awarded damages to Lucero's estate for her pain, mental anguish, and medical expenses. No damages were awarded to Larry and Rickey Lucero. The jury further found that Tech had notice of the claim not later than six months after the occurrence of the incident giving rise to the claim. The trial court denied Tech's motion for judgment *non obstante veredicto,* and entered judgment for the estate in the amount of $250,000. This appeal follows.

### NOTICE

■ In Issue One, Tech complains that Lucero failed to provide the notice required by Section 101.101 of the Act. It contends that notice is jurisdictional and must be reviewed *de novo.*[2] Lucero responds that notice is not jurisdictional and that the jury's finding must be reviewed under the traditional legal sufficiency standard.[3] We agree with Lucero.

#### *The Statutes and The Amendment*

■ Section 101.101 provides that:

(a) A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1) the damage or injury claimed;

(2) the time and place of the incident; and

(3) the incident.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.101(a)(Vernon 2005). Proper notice ensures prompt reporting of claims to enable governmental units to gather information necessary to guard against unfounded claims, to settle claims, and to prepare for trial. *City of Houston v. Torres,* 621 S.W.2d 588, 591 (Tex.1981).

■ The notice requirements do not apply if the governmental unit has *actual* notice. TEX.CIV.PRAC. & REM.CODE ANN. § 101.101(c). Actual notice requires knowledge of (1) death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved. *Cathey v. Booth,* 900 S.W.2d 339, 340 (Tex. 1995). The governmental unit must have subjective awareness that its purported fault could have produced or contributed to the death, injury, or property damage, but it is not required to know that the claimant has actually alleged fault. *Texas Department of Criminal Justice v. Simons,* 140 S.W.3d 338, 347–48 (Tex.2004).

In *Simons,* the Supreme Court held that although the notice requirement is mandatory, it is not jurisdictional. *Id.* at 348–49. In an opinion issued the same date, the court held that notice is not a condition of the Act's waiver of immunity. *University of Texas Southwestern Medical Center at Dallas v. Loutzenhiser,* 140 S.W.3d 351, 364 (Tex.2004). Because notice is not jurisdictional, a governmental unit cannot raise it in a plea to the jurisdiction nor can it obtain interlocutory appellate review if

---

**2.** Tech sets forth the legal sufficiency standard established in *City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005) but argues throughout its brief that notice is jurisdictional.

**3.** Because Tech did not raise factual sufficiency in a motion for new trial, the issue is waived. *See* TEX R.CIV.P. 324(b)(2), (3).

the trial court refuses to dismiss the suit. *Simons,* 140 S.W.3d at 349.

The Legislature has since amended Section 311.034 of the Government Code to provide that:

Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity.

TEX.GOV'T CODE ANN. § 311.034 (Vernon Supp.2006). The statute's effective date was September 1, 2005 and the Legislature did not provide for retroactive application. This case was tried and judgment entered prior to September 1, 2005.

■■■ We generally presume that the Legislature intends an amendment to operate prospectively and not retroactively. *Subaru of America, Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219 (Tex. 2002); TEX.GOV'T CODE ANN. § 311.022 (Vernon 2005)(a statute is presumed to be prospective in its operation unless expressly made retrospective). This presumption does not apply when the amendment is procedural or remedial because procedural and remedial statutes typically do not affect a vested right. *Subaru,* 84 S.W.3d at 219. A statute conferring or ousting jurisdiction applies to existing suits because such laws generally do not affect substantive rights. *Id., citing Landgraf v. USI Film Prods.,* 511 U.S. 244, 274, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Instead, jurisdictional statutes speak to the court's power rather than to the parties' rights or obligations. *Id.* And a jurisdictional statute usually does not take away substantive rights but simply changes the tribunal that is to hear the case. *Id.*

The Beaumont Court of Appeals has determined that the 2005 amendment applies retroactively because it is a jurisdictional statute and does not affect substantive rights. *Texas Department of Criminal Justice v. Simons,* 197 S.W.3d 904, 907 (Tex.App.-Beaumont 2006, no pet.), *citing Subaru of America,* 84 S.W.3d at 220. Instead, it merely changes the point at which a governmental entity may appeal. 197 S.W.3d at 907. We disagree because we do not view the amendment as merely impacting when a governmental entity may appeal. Pursuant to the amendment, a plaintiff's suit is barred by sovereign immunity unless the plaintiff pleads and proves notice. A governmental unit now has an unwaivable right to notice and can raise this jurisdictional defect for the first time on appeal. This is a significant alteration of the *Simons* and *Loutzenhiser* rule that notice is subject to waiver. We will presume that the Legislature did not intend for the amendment to apply retroactively. Pursuant to the Supreme Court's decisions in *Simons* and *Loutzenhiser,* we reject Tech's argument that it retained sovereign immunity if the Lucero plaintiffs failed to comply with Section 101.101.

### *Standard of Review*

■■■ The jury's finding on the notice issue is subject to legal sufficiency review. There are two separate legal insufficiency claims. When the party without the burden of proof suffers an unfavorable finding, the challenge is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik,* 726 S.W.2d 207, 210 (Tex.App.-Fort Worth 1987, writ ref'd n.r.e.). Where the party having the burden of proof suffers an unfavorable finding (failure to find), the proper complaint is that the fact was established as "a matter of law." *See Sterner v. Marathon Oil Company,* 767 S.W.2d 686, 690 (Tex.1989). Here, Tech filed a verified special denial that it received timely notice. Consequently, Lucero had the burden to plead and secure a finding on notice. *See Texas Tech University Health Sciences Center v.*

*Apodaca*, 876 S.W.2d 402, 410–11 (Tex. App.-El Paso 1994, writ denied)(holding that where the governmental unit filed a verified special denial that it received timely actual notice, the plaintiff had the burden to prove and secure a finding on actual notice at trial); *see also Harrison v. Texas Department of Criminal Justice–Institutional Division*, 915 S.W.2d 882, 890 (Tex. App.-Houston [1st Dist.] 1995, no writ)(plaintiff alleged notice and defendant failed to deny it; consequently, lack of notice was not a ground for recovery); *Huckabay v. Irving Hospital Foundation*, 802 S.W.2d 758, 761 (Tex.App.-Dallas 1990, writ denied)(notice is an indispensable element of the plaintiff's cause of action). Accordingly, we will apply the "no evidence" standard.

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). We construe Tech's argument as falling within the first circumstance which necessarily precludes us from automatically disregarding contrary evidence in a legal sufficiency review. *Id.* at 810–11 (stating that contrary evidence may not be disregarded in sufficiency reviews under the first, second, and fourth circumstances).

In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes, so

long as more than one inference is possible. *Id.* at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.* We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id.* at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id.* at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id.* at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier of fact. *Id.* The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

### Written Notice

Section 101.101 requires that the plaintiff provide written notice of the claim not later than six months after the day that the incident giving rise to the claim occurred. Lucero's petition identified two incidents: the ERCP performed on July 13, 2001, and the abdominal CT scan performed on August 16, 2001. Because Lucero did not provide written notice of the claim arising from these incidents until May 13, 2002, notice was untimely.

### Actual Notice

One of the plaintiffs' primary theories of recovery is that Tech misinterpreted the CT scan performed on August

16, 2001. As a result, it failed to remove the stent in a timely manner and Lucero developed an abscess in the liver. For the plaintiffs to prevail, the evidence must show that Tech had knowledge of the injury, its alleged fault producing or contributing to the injury, and the identity of the parties involved. *See Cathey,* 900 S.W.2d at 340. Actual notice also requires a showing that Tech had a subjective awareness that its purported fault could have produced or contributed to the death, injury, or property damage. *Simons,* 140 S.W.3d at 348.

Shortly after he performed the September 21 ERCP, Dr. Hernandez viewed the films of the August 16 CT scan and determined that the radiologist had misread them. In his opinion, the CT scan showed that the stent was going out of the biliary system into the subhepatic fossa. He called Dr. Prasad and informed him of "[e]xactly what [he] found." Dr. Prasad recalled that they viewed the films together. Dr. Hernandez told Dr. Prasad that Lucero had been admitted under his care, that he had performed an ERCP, that the stent had migrated and was protruding through the bile duct, and that there was a bile leak. While Dr. Hernandez did not specifically say that he informed Dr. Prasad of his interpretation of the CT scan, a reasonable jury could infer that he did so since the two doctors reviewed the films together and Dr. Hernandez told him "[e]xactly what [he] found." From this conversation, Dr. Prasad had knowledge of the bile leak, knowledge of the patient's identity, and knowledge that he had misread the August 16 CT scan. A jury could reasonably infer that Dr. Prasad knew after speaking with Dr. Hernandez that his misinterpretation of the CT scan led to the bile leak being undiagnosed for more than a month. This constitutes subjective awareness that his alleged fault could have produced or contributed to Lucero's injury. We conclude the evidence is legally sufficient to establish that Tech had actual notice of Lucero's injuries caused by the misinterpretation of the August 16 CT scan. Issue One is overruled.

## SOVEREIGN IMMUNITY

In Issue Two, Tech contends that there was no waiver of sovereign immunity because Lucero's claims are based on the non-use of personal property. When a lawsuit is barred by sovereign immunity, the trial court lacks subject matter jurisdiction and dismissal with prejudice is proper. *Sepulveda v. County of El Paso,* 170 S.W.3d 605, 610 (Tex.App.-El Paso 2005, pet. denied); *City of Austin v. L.S. Ranch, Ltd.,* 970 S.W.2d 750, 752 (Tex.App.-Austin 1998, no pet.). Subject matter jurisdiction is a legal question which we review *de novo. Sepulveda,* 170 S.W.3d at 610; *City of Saginaw v. Carter,* 996 S.W.2d 1, 2 (Tex.App.-Fort Worth 1999, pet.dism'd w.o.j.).

### *The Statute*

As a state agency, Tech is immune from suit unless that immunity is waived. The Tort Claims Act does not waive sovereign immunity for all negligence claims against governmental units. *Texas Department of Criminal Justice v. Miller,* 51 S.W.3d 583, 588 (Tex.2001). Relevant to this case, the Act provides that a governmental unit in the state is liable for:

> [P]ersonal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 2005).

To state a claim under the Act based upon the use or misuse of non-

defective tangible personal property, a plaintiff must allege that the property was used or misused by a governmental employee acting within the scope of his or her employment. *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex.1983); *Sepulveda*, 170 S.W.3d at 614–15. The negligence of the governmental employee must be the proximate cause of the injury and must involve a use or misuse of tangible personal property under circumstances where there would be private liability. *Salcedo*, 659 S.W.2d at 32; *Sepulveda*, 170 S.W.3d at 615. "Use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Miller*, 51 S.W.3d at 588, *quoting Texas Natural Resource Conservation Commission v. White*, 46 S.W.3d 864, 869 (Tex.2001). The usage of the property must have actually caused the injury. *Miller*, 51 S.W.3d at 588; *see San Antonio State Hospital v. Koehler*, 981 S.W.2d 32, 35 (Tex.App.-San Antonio 1998, pet. denied)(use of the property must be a substantial factor in bringing about the injury). Incidental involvement of the property is insufficient. *Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998). Property does not cause injury if it does no more than furnish the condition that makes injury possible. *Bossley*, 968 S.W.2d at 343. The Act does not provide for liability based upon a non-use of property. *Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex.1994); *Sepulveda*, 170 S.W.3d at 615.

### The Pleadings

The amended petition alleged that Lucero's death was proximately caused by:

- the negligent misuse of equipment in the performance of the July 2001 ERCP;
- the failure to perform an ERCP in August, September, or October 2001 to diagnose the cause of her increased abdominal pain in August 2001;
- the negligent misuse of equipment in August 2001, specifically an abdominal CT scan that indicated liver abscess; and
- the failure to properly and timely diagnose and treat Lucero's bile leak, liver bilomas, and abcess.

The first allegation addresses the misuse of equipment in the July 2001 ERCP performed by Dr. Prasad. Thus, it ostensibly states a claim which falls within the Act's waiver of immunity. But there is no evidence that Dr. Prasad misused the stent or any other equipment during the ERCP procedure. To the contrary, there is evidence that Dr. Prasad correctly placed the stent. Consequently, there is no waiver of sovereign immunity based on the first allegation. The second allegation merely alleges a failure to perform a procedure and does not allege the use or misuse of tangible personal property. Therefore, it does not fall within Section 101.021(2)'s waiver of sovereign immunity either.

With regard to the third and fourth allegations, the Lucero plaintiffs attempt to bring their claims within the Act by alleging the misuse of the abdominal CT scan and the related failure to diagnose the bile leak. Tech counters that these allegations are based on the non-use of medical information, a claim for which sovereign immunity is not waived. Our analysis requires a discussion of four relevant Supreme Court cases.

### The Supreme Court Speaks ...

In *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30 (Tex.1983), a patient's electrocardiogram readings showed a classic heart attack pattern but an emergency room physician released him. *Id.* at 31. The patient collapsed shortly after returning home and died as the result of

myocardial infarction. *Id.* His widow filed suit and pled that employees or agents of the hospital district misused the electrocardiographic equipment by improperly reading and interpreting the graphs and charts produced by the equipment. *Id.* Noting that reading and interpreting are purposes for which an electrocardiogram graph is used in diagnosing myocardial infarction, the Supreme Court held that the allegations stated a cause of action under the Tort Claims Act because it alleged a misuse of tangible personal property. *Id.* at 33.

In *University of Texas Medical Branch at Galveston v. York*, the plaintiffs brought suit against UTMB for negligence in failing to diagnose a broken hip. *University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175 (Tex.1994). They alleged that the failure to record medical information in the patient's chart and to follow a recommendation in the medical records for an x-ray of the patient's hip was a misuse of tangible personal property which waived immunity. *Id.* The Supreme Court decided *Salcedo* was not factually analogous because the plaintiffs had not alleged misuse of any hospital device or equipment. *Id.* at 178. While the paper on which doctors and nurses record information about a patient's condition is tangible, information is intangible. The fact that "information" is recorded in writing does not render it tangible property within the meaning of the Act. *Id.* at 178–79.

The Supreme Court reached the same conclusion in *Kassen v. Hatley*, 887 S.W.2d 4 (Tex.1994). There, a psychiatric patient who was threatening to harm herself was taken by a police officer to a psychiatric emergency room. The facility had a "difficult patient file" on her, which recommended that she be referred to Dallas County MHMR unless she presented with different symptoms than in the past. When a doctor decided to release her, she became angry and threatened to kill herself by walking into traffic. The doctor and the charge nurse did not return her medication because she admitted exceeding her dosage. A security officer escorted her from the hospital. The patient committed suicide shortly after leaving Parkland Hospital by stepping into freeway traffic. Her parents filed a wrongful death action against the doctor, the charge nurse, and Parkland. The court held that a psychiatric patient's medical records, her "difficult patient file," and the state hospital's emergency room procedural manual are not tangible personal property such that the use, misuse, or non-use of these items did not support a claim under the Act. *Kassen*, 887 S.W.2d at 14.

The Supreme Court subsequently limited *Salcedo* to its facts in *Dallas County MHMR v. Bossley*, 968 S.W.2d 339, 342 (Tex.1998). There, a patient escaped from a mental health facility through an unlocked door and died when he threw himself in front of a moving vehicle. The plaintiffs attempted to bring the case within the Tort Claims Act by alleging that the patient's death was caused by a member of the facility leaving a door unlocked. The trial court granted the defendant's motion for summary judgment based on sovereign immunity. The Dallas Court of Appeals reversed, relying upon the statement in *Salcedo* that negligent conduct for which immunity is waived must involve some condition or some use of tangible property. The court construed this statement to mean that for immunity to be waived, the property does not have to be the instrumentality of harm-it need only be involved. *Bossley*, 968 S.W.2d at 342. In reversing, the Supreme Court focused on this misinterpretation of *Salcedo*, concluding that the unlocked doors permitted the patient to escape, but did not cause his death. *Id.* at 343. The use and condition of the doors

were too attenuated from the patient's death to have caused it. *Id.*

### . . . And The Intermediate Courts Interpret

Although Tech contends that *Salcedo* is not viable authority, the Supreme Court has not overruled it. Intermediate appellate courts have continued to apply *Salcedo* where the plaintiff has alleged a misuse of diagnostic medical equipment. *See University of Texas Medical Branch at Galveston v. Estate of Blackmon,* 169 S.W.3d 712, 721–22 (Tex.App.-Waco 2005)(nurse's use or misuse of stethoscope and pulse oxymeter was proximate cause of inmate's death from severe pneumonia for purposes of establishing waiver of sovereign immunity on grounds of use of tangible personal property), *vacated and appeal dismissed for want of jurisdiction,* 195 S.W.3d 98 (Tex.2006)(while UTMB's interlocutory appeal from the denial of its plea to the jurisdiction was pending in the court of appeals, the plaintiff filed a nonsuit which deprived the court of appeals of jurisdiction); *Baston v. City of Port Isabel,* 49 S.W.3d 425, 428–29 (Tex.App.-Corpus Christi 2001, pet. denied)(relying on *Salcedo,* court held that the plaintiff's allegation of negligence in failing to properly monitor a cardiac monitor was a use of tangible personal property); *University of Texas Medical Branch Hospital at Galveston v. Hardy,* 2 S.W.3d 607, 609–10 (Tex.App.-Houston [14th Dist.] 1999, pet. denied)(plaintiffs' allegations of negligent use or misuse of an EKG stated a claim under the Act; court rejected defendant's argument that *Salcedo* was no longer viable).

Only the San Antonio Court of Appeals has refused to apply *Salcedo,* finding that it was no longer viable in the wake of *Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540 (Tex.2003). *See Anderson v. City of San Antonio,* 120 S.W.3d 5, 8 (Tex.App.-San Antonio 2003, pet. denied). But *Whitley* did not involve an allegation of misuse of diagnostic medical equipment. The plaintiff was riding on a bus when he was harassed and threatened by a female passenger named Burkley. *Whitley,* 104 S.W.3d at 541–42. The bus driver asked Whitley to exit the bus and told him he would pick him up in a few minutes. *Id.* at 542. Burkley threatened to kill the plaintiff as he exited. *Id.* The bus traveled two blocks and Burkley exited. *Id.* She recruited family members to assault the plaintiff. *Id.* Finding the plaintiff where the bus driver had left him, they severely beat him. *Id.* The plaintiff alleged in his suit against DART that a city bus driver wrongfully ejected him in a remote and dangerous area of Dallas, allowed another passenger to exit the bus after she had assaulted and threatened the plaintiff in the driver's presence, and then failed to pick him up as promised. *Id.* The Supreme Court found that the plaintiff's injuries did not arise from the use of the bus, but rather from the assailants' actions and the driver's failure to supervise the public. *Id.* at 542–43. Thus, there was no nexus between the operation or use of the motor vehicle and the plaintiff's injuries. *Id.* at 543.

*Anderson* involved the purported use or misuse of electrocardiograms (EKGs). Emergency medical technicians (EMTs) were dispatched to the residence of the decedent who was experiencing severe chest pain and left arm numbness. *Anderson,* 120 S.W.3d at 6. The EMTs performed two EKGs and decided that Anderson didn't need to be taken to the hospital. *Id.* Later the same day, Anderson experienced more chest pain. This time, he was taken to the hospital but he died that evening. *Id.* The plaintiffs alleged that the EMTs negligently used the EKG. *Id.* But the court held that the decedent's death was caused by his cardiac

condition and the EMTs' alleged negligence, not by the use of the EKG machine itself. *Id.* at 9.

Because we disagree with the San Antonio court's interpretation of *Whitley,* we will apply *Salcedo.* Like the electrocardiogram graph in *Salcedo,* an abdominal CT scan and its films are used in diagnosing various conditions of the abdomen. The Lucero plaintiffs alleged and offered evidence to prove that there was a misuse of the abdominal CT scan performed on August 16, 2001. Finding a waiver of sovereign immunity, we overrule Issue Two. *See Salcedo,* 659 S.W.2d at 33. Having overruled both issues for review, we affirm the judgment of the trial court.