**THE HOUSING AUTHORITY OF THE CITY OF BEAUMONT, Appellant,**

v.

**Bernadette LANDRIO, Individually and as Parent and Natural Guardian of D.S.; Ida Faye Guidry, Individually and as Parent and Natural Guardian of M.J.W.; Mary Frances Sias, Individually and as Parent and Natural Guardian of S.S.; and Carole Conway, Individually and as Parent and Natural Guardian of D.C.T., III; Appellees.**

No. 09–08–136 CV.

Court of Appeals of Texas, Beaumont.

Submitted June 26, 2008.

Decided Oct. 30, 2008.

As Corrected Dec. 1, 2008.

proximately caused the children's injuries. On the record presented, disputed jurisdictional fact issues preclude granting BHA's plea. We therefore affirm the trial court's order.

H. Scott Alexander, Strong Pipkin Bissell & Ledyard, LLP, Beaumont, for appellant.

B. Adam Terrell, Green, Toups & Terrell, LLP, Thomas A. Peterson, Peterson, Petit & Peterson, LLP, Beaumont, for appellees.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

DAVID GAULTNEY, Justice.

The Housing Authority of the City of Beaumont (BHA) appeals the denial of its plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(8) (Vernon 2008). Plaintiffs Bernadette Landrio, Ida Faye Guidry, Mary Frances Sias, and Carole Conway, individually and on behalf of their minor children, claim their children were injured by exposure to lead-based paint at BHA-owned apartments.[1] Plaintiffs contend BHA knew or should have known of the lead paint hazard at the apartment complexes. The trial court denied BHA's plea to the jurisdiction. BHA argues the trial court erred because plaintiffs (1) failed to establish that they provided timely written notice, or that BHA had "actual notice" of the injuries under section 101.101 of the Texas Civil Practice and Remedies Code; (2) failed to establish waiver of BHA's immunity under the Texas Tort Claims Act; and (3) failed to offer sufficient evidence to show that exposure to lead paint at the BHA-owned premises

GOVERNMENTAL IMMUNITY AND DISPUTED JURISDICTIONAL FACTS

■ A governmental unit generally is immune from suit unless that immunity has been waived. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex.2004); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999) (per curiam); *Brenham Hous. Auth. v. Davies*, 158 S.W.3d 53, 56–57 (Tex.App.-Houston [14th Dist.] 2005, no pet.). The Texas Tort Claims Act waives governmental immunity to suit in certain specified circumstances. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021–101.029 (Vernon 2005 & Supp. 2008). Under the Act, immunity to suit is waived only to the extent immunity from liability is waived; the two immunities are co-extensive under the statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.025(a) (Vernon 2005); *Miranda*, 133 S.W.3d at 224.

■ Unless waived, a governmental unit's immunity from suit deprives a trial court of subject matter jurisdiction. *Miranda*, 133 S.W.3d at 224; *Jones*, 8 S.W.3d at 638. A housing authority is a governmental unit and has the right to an interlocutory appeal of a trial court's denial of a plea to the jurisdiction. TEX. LOC. GOV'T CODE ANN. § 392.006 (Vernon Supp.2008); TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(8). Appellate review of a trial court's ruling on a plea to the jurisdiction is *de novo*. *Miranda*, 133 S.W.3d at 226.

---

1. 1960 Cottonwood (Concord Homes) and 3720 Magnolia Street (Magnolia Gardens) in

Beaumont, Texas

In addressing the jurisdiction issue, an appellate court does not decide disputed facts intertwined with the merits of the underlying claim. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex.2000). Whether a pleading or undisputed evidence demonstrates a trial court's jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 226.

The pleadings are to be construed in the plaintiff's favor. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002). If the pleadings are not sufficient to affirmatively demonstrate the trial court's subject matter jurisdiction, but the pleading deficiency nevertheless appears curable, "the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend." *Miranda*, 133 S.W.3d at 226–27 (citing *Brown*, 80 S.W.3d at 555). If the pleadings affirmatively negate the existence of subject matter jurisdiction, "then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

If jurisdictional evidence is undisputed, the trial court rules on the plea as a matter of law. *Id.* at 228. But when disputed evidence of material jurisdictional facts implicates the merits of the case, the facts must be determined by the fact finder before the plea can be granted. *See Id.* at 227–28.

### Elevated Lead Levels

Plaintiff Bernadette Landrio's son was born on June 17, 1996. The Landrios lived in apartment number 14 of Magnolia Gardens from November 14, 1997, through January 2001. At orientation prior to moving in, Landrio obtained and read information entitled "Protect Your Family from Lead in Your Home" and "The Danger of Lead Poisoning to Renters."

Landrio's son was diagnosed with elevated blood lead levels on February 23, 1998, May 6, 1998, and August 6, 1998. Landrio did not recall seeing him ingest paint while living at the apartments. In February 1998, Landrio complained to someone in the apartment manager's office about her son's elevated blood lead level, and requested a transfer out of the complex. The individual told Landrio there were alternative " 'ways [to] deal with lead,' " and gave Landrio pamphlets about eating fruits and vegetables. While in the office, Landrio also told Jimmy Jackson, the apartment manager, that her son had high lead levels and that she wanted to be moved from the complex. Jackson told Landrio that he would " 'go check out the apartment.' "

Plaintiff Mary Frances Sias's daughter was born on April 22, 1996. Mother and daughter lived in Concord Homes, first in apartment number 146 and later in apartment number 149 from May 1996 through January 1999. Mary Sias recalled reading documents warning of lead paint at an orientation session.

Sias's daughter was diagnosed with elevated blood lead levels on April 22, 1998, and July 20, 1998. Although Mary Sias did not verbally report her daughter's elevated blood lead level diagnosis to BHA personnel, her attorney sent BHA a letter regarding her claim on October 16, 1998, within six months of the diagnosis. Mary Sias could not recall seeing her daughter put paint in her mouth. She complained to apartment personnel that paint was peeling in her apartment, but could not recall when she made the complaint.

Plaintiff Ida Faye Guidry's daughter was born on May 28, 1994. They lived in apartment number 24 of Concord Homes until about October 1997, and in apartment number 13 from approximately October 1997 to November 1999. When Guidry

first leased at Concord Homes, and at each renewal, she received documents from BHA entitled "Watch Out for Lead Paint Poisoning" and "The Danger of Lead Poisoning to Renters." The documents informed the residents of possible lead paint in BHA-owned apartments. In 1993, she also received a document from BHA entitled "Lead–Based Paint, a Threat to Your Children."

Guidry's daughter was diagnosed with elevated blood lead levels on January 20, 1998, January 30, 1998, and February 20, 1998. Guidry testified that her daughter put paint in her mouth in January or February of 1995 while they were living at the apartments; the daughter was eight or nine-months-old at the time. Guidry removed a quarter-sized paint chip from her daughter's mouth, but did not know if she swallowed paint on that occasion or any other. Guidry recalled seeing paint chips on the floor and paint peeling from the living room wall. Her daughter began running fever and Guidry took her to a doctor. Although the doctor did not tell Guidry the reason for the fever, Guidry believed the sickness resulted from the paint.

Guidry testified that in January 1998 she had a conversation with Ernest Wilson, a BHA employee, in the apartment manager's office. She told him that her daughter had put a paint chip in her mouth in 1995 and "it made her sick," and reported her daughter's elevated lead levels. Guidry also testified that in May 1998 she received a letter from the City of Beaumont regarding lead exposure and eating fruits and vegetables. For some period of time after she told Wilson about the paint chip, Wilson gave Guidry a $30 allowance every two weeks to purchase fruits and vegetables.

Plaintiff Carole Conway's son was born on October 29, 1994. They lived in apartment number 39 in Concord Homes from June 1996 to February 1999. She saw her son eat paint chips in 1996 while they were living in the apartments. He was diagnosed with elevated blood lead levels on December 16, 1996, January 2, 1997, August 4, 1997, March 24, 1998, and August 11, 1998. In early January 1997, she informed Jackie Flanagan that her son tested "positive for lead." Two or three days later, she told apartment manager Jimmy Anderson that her son tested positive for lead and that she had seen him eat paint chips. The next day, she provided a copy of the test results to the BHA employee at Will Jackson's request. In February or March of 1997, Conway told Tammy Williams with BHA that her son had tested positive for elevated lead levels and that she had given his test results to Jackson. In May or June of 1997, when Conway was re-certified for her apartment, she received a lead warning packet from BHA and again mentioned her son's prior elevated lead levels.

### SECTION 101.101 AND THIS COURT'S JURISDICTION

Section 101.101 of the Texas Civil Practice and Remedies Code provides that:

(a) A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1) the damage or injury claimed;

(2) the time and place of the incident; and

(3) the incident.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.101(a) (Vernon 2005). Proper notice assures prompt reporting of claims, allows governmental units to gather information

necessary to guard against unfounded claims, and enables settlement or preparation for trial. *City of Houston v. Torres*, 621 S.W.2d 588, 591 (Tex.1981).

The notice requirements of subsection (a) "do not apply" if the governmental unit has "actual notice ... that the claimant has received some injury[.]" TEX. CIV. PRAC. & REM.CODE ANN. § 101.101(c) (Vernon 2005). "Actual notice" includes subjective awareness by the governmental unit that its fault produced or contributed to the claimed injury. *See Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 348 (Tex.2004); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 101.101. "[A]ctual notice is a fact question when the evidence is disputed." *Simons*, 140 S.W.3d at 348.

The Supreme Court held in *Univ. of Tex. S.W. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 364 (Tex.2004), that lack of notice does not deprive the trial court of subject matter jurisdiction. However, the Legislature subsequently amended Section 311.034 to provide that effective September 1, 2005, notice is a jurisdictional requirement in all suits against a governmental entity. *See* TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp.2004), *amended by* Act of May 25, 2005, 79th Leg., R.S., ch. 1150, § 1, 2005 Tex. Gen. Laws 3783 (current version at TEX. GOV'T CODE ANN. § 311.014 (Vernon Supp.2008)); *Tex. Dep't of Criminal Justice v. Simons*, 197 S.W.3d 904, 907 (Tex.App.-Beaumont 2006, no pet.). Appellees argue that section 311.034 should not be applied retroactively, and therefore this Court lacks jurisdiction to consider the notice issue in this interlocutory appeal.

We held otherwise in *Simons*, 197 S.W.3d at 907. We considered the 2005 amendment to work a procedural change, because "[a] claimant who has not given either timely written notice or actual notice has no vested right to recover under the [Texas Tort Claims Act], and the amendment merely enables the governmental entity to appeal the issue before entry of a final judgment rather than after." *See id.* Our decision in *Simons* conflicts with another court of appeals' decision on the issue. *See Tex. Tech. Univ. Health Sciences Ctr. v. Lucero*, 234 S.W.3d 158 (Tex.App.-El Paso 2007, pet. denied). In *Lucero*, the court characterized the notice requirement as "unwaivable," because the requirement is now jurisdictional after the 2005 amendment, and therefore the court presumed the Legislature did not intend for the amendment to apply retroactively. *Id.* at 166. We are not persuaded that notice would necessarily be "unwaivable" under all circumstances simply because notice under the amended statute is now jurisdictional. *See, e.g., Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex.2006) ("We have previously discussed the possibility that a governmental entity might waive its immunity by certain actions, even absent a legislative waiver of immunity."). We decline the request to revisit our decision in *Simons*. We overrule appellees' challenge to this Court's jurisdiction to address the notice issue in this interlocutory appeal. *See Simons*, 197 S.W.3d at 907.

## THE NOTICE DISPUTE

In its first issue, BHA argues the trial court erred because plaintiffs failed to establish timely written notice or actual notice. Plaintiffs asserted BHA had actual notice of the occurrences that are the basis of the suit. Counsel for plaintiffs Conway, Guidry, and Sias sent a letter on their behalf to BHA on October 16, 1998, and for Landrio on December 4, 1998. The letters stated that they served to provide BHA with additional notice (pursuant to section 101.101 of the Texas Tort Claims Act) of the plaintiffs' claims re-

garding lead exposure at the housing complexes. The letters further stated: (1) the apartments where the plaintiffs resided were contaminated, resulting in plaintiffs' high lead levels; (2) the adult-plaintiffs had been notified that their children suffered from elevated blood lead levels; and (3) that actual notice of the condition had previously and timely been given to BHA through its agents and employees. The letters asserted BHA had actual knowledge of the existence of lead in the housing complexes, and BHA had "refused to undertake any steps to protect those persons similarly situated as [minor-plaintiffs]."

Plaintiffs produced for the trial court a document dated "12/96" and entitled "Beaumont Housing Authority[:] The Danger of Lead Poisoning to Renters." The document stated, in part, the following:

This housing or apartment was built before 1950. There is a possibility that it may contain lead paint. Lead paint is poisonous if eaten. Many children do eat paint flakes and frequently become very sick. You as a parent are in the best position to safeguard your child's health by preventing him or her from eating paint or paint chips. This pamphlet will answer some of your questions about how to know if your child has been eating lead paint and what to do about it.

. . . .

The most common cause of lead poisoning is lead-based paint. Children can get dangerous amounts of lead from eating even very small amounts of such paint. Unfortunately, usually there are no obvious signs of lead poisoning. Often lead poisoning can seem like a number of other childhood diseases, but if your child has stomach aches and vomiting, has headaches, a loss of appetite, is cranky or frequently is too tired to play, he may have lead poisoning. Any or all of these symptoms can be signs of lead poisoning. Often, there are no symptoms at all. . . .

Blood screening programs are usually free and will test children for lead even if they show no symptoms of poisoning and have not been seen eating paint. . . .

. . . .

If tests show that your child has a high level of lead in his blood, he will need medical supervision and possibly treatment. If treatment is necessary, your doctor, a local clinic, or hospital will be able to remove the lead in your child's blood. Such treatments may be paid for by Medicaid or your local health department. If testing shows that your child has a lot of lead in his blood, your local health department may send someone to measure the lead paint in your home, and may require treatment by the owner of the unit of the lead paint hazards on walls and woodwork. . . .

. . . .

You should stop your child from eating or chewing paint and other objects that may contain lead. Warn your child of the dangers of eating anything other than food if he is old enough to understand. . . .

Plaintiffs also offered deposition testimony from Judith Ann Cobble Stansbury, an employee of BHA from 1989 to 1996. Stansbury's deposition testimony was from an unrelated claim against BHA. She was employed as the secretary to the executive director of BHA, and the assistant to the Comprehensive Improvement Assistance Program (CIAP) Director. On some occasions when the CIAP Director position was vacant, Stansbury assumed the director's responsibilities. CIAP involved major renovations for BHA-owned apartment complexes, and Stansbury's responsibilities included making requests for grant money

for renovations. According to Stansbury, HUD mandated testing for lead-based paint in all BHA's complexes. She testified that in 1993 or 1994, the tests results for Magnolia Gardens and Concord Homes showed high levels of lead. Stansbury's testimony, when considered with the BHA document stating that "[m]any children do eat paint flakes and frequently become very sick[,]" presented the trial court with some evidence BHA knew lead in the apartments could contribute to elevated blood lead levels in children who lived in the apartments.

According to Bernadette Landrio's testimony, the same month that her son was first diagnosed with elevated blood lead levels, she informed BHA's apartment personnel of his condition and of the injury claimed. Plaintiff Ida Guidry had knowledge that her daughter put paint in her mouth in early 1995. There is some evidence Guidry did not have knowledge that her daughter had high levels of lead in her blood until January 1998, however. Guidry testified that in January 1998 she notified apartment personnel of what happened and the injury claimed. Plaintiff Mary Frances Sias' daughter was first diagnosed with elevated blood levels in April 1998. Although Sias did not recall seeing her daughter eat paint chips, she did report paint peeling in her apartment, and her attorney did provide written notice of the claim within six months of the diagnosis. Plaintiff Carole Conway witnessed her son eat paint chips in 1996. He was first diagnosed with elevated blood lead levels in December 1996. In January 1997, Conway informed apartment personnel of the diagnosis and of Conway's having seen him eat paint chips.

The trial court was presented with some evidence that the plaintiffs informed BHA of the diagnoses within six months of learning of the elevated lead levels. Nevertheless, BHA argues plaintiffs were required to give notice of the claims of legal responsibility within six months of an incident, not simply the diagnosis of high lead levels in the blood. Relying on *Sanford v. Texas A & M University*, 680 S.W.2d 650 (Tex.App.-Beaumont 1984, writ ref'd n.r.e.) and *Putthoff v. Ancrum*, 934 S.W.2d 164 (Tex.App.-Fort Worth 1996, writ denied), BHA also contends the discovery rule does not apply to the notice provisions under the Texas Tort Claims Act.

In *Sanford*, the plaintiff was exposed to a strong pesticide while he was working as a telephone repairman on the premises of Texas A & M University Agricultural Research and Extension Center on June 29, 1975. *Sanford*, 680 S.W.2d at 651. Almost immediately, he experienced symptoms from the exposure, and he complained of fainting spells and dizziness over the next five years. *Id.* None of the numerous doctors he consulted during this period told him his medical problems were related to the June 1975 exposure. *Id.* After experiencing kidney trouble, Sanford consulted a doctor in September 1980. The doctor related his medical problems to the June 1975 exposure. *Id.* Appellant sued Texas A & M University, Texas A & M University Agricultural Research and Extension Center, and Katy Pest Control, for personal injuries under the Texas Tort Claims Act. *Id.* at 650–51. Texas A & M University and the Agricultural Research and Extension Center filed a motion for summary judgment based on the two-year statute of limitations and the six-months notice provision in the Texas Tort Claims Act. *Id.* at 651. The trial court granted the motion for summary judgment. *Id.* This Court found no evidence that a notice of claim for injury was given within six months of June 29, 1975, and held that the discovery rule is not applicable "to the instant cause of action[.]" *Id.* at 652.

In *Putthoff*, parents sued Tarrant County and two Tarrant County medical examiners for damages caused by an alleged negligently performed autopsy of their child. *Putthoff*, 934 S.W.2d at 166. The child died on March 19, 1991, of asphyxiation. *Id.* Believing the child had been murdered, the parents hired a pathologist to exhume the body and perform an examination to independently determine the cause and manner of death. *Id.* at 167. The pathologist could not find certain body parts that had allegedly been sewn up in decedent's body, but found that the decedent's death was " 'suspicious of a homicide by asphyxia.' " *Id.* The county contended the parents' causes of action were barred because the parents failed to provide the county with timely notice of the claim. *Id.* at 173. The Second Court of Appeals held that the parents' claims were barred as a matter of law, because it was "undisputed" that written or actual notice was not provided to Tarrant County within six months of the incident giving rise to the parents' assertion of a claim for negligence. *Id.* at 174.

The plaintiffs in *Sanford* and *Putthoff* alleged damage from a distinct incident on a date certain from which to measure the sixth-month notice requirement. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.101(a). In contrast, the information BHA provided the parents informed them of the availability of blood screening and stated, "If testing shows that your child has a lot of lead in his blood, your local health department may send someone to measure the lead paint in your home, and may require treatment by the owner of the unit of the lead paint hazards on walls and woodwork[.]"

The statute does not require notice of a nonexistent claim. *See Loutzenhiser*, 140 S.W.3d at 356–57. The diagnosis of a high level of lead in the child's blood was the incident that gave rise to a claim against BHA. Under the circumstances in this case, the incident subject to the notice requirement of the Texas Tort Claims Act ("TTCA") was the diagnosis of increased lead levels in the blood. No injury claim of elevated blood lead levels existed until that determination was made.

If the evidence at trial establishes BHA knew the apartments in fact had lead paint that would likely be ingested by the children, a report of high blood levels in a child would provide sufficient information to BHA that an injury may have occurred on which a claim of BHA's fault in failing to repair the condition might be made. BHA's notices to the plaintiffs of possible lead-based paint exposure, the testimony of Judith Stansbury, and the plaintiffs' testimony raise a fact question to be resolved by the fact finder as to whether BHA had a subjective awareness that the condition of the premises may have caused or contributed to the claimed injuries.

Disputed jurisdictional fact issues are intertwined in this case with the merits of the fault claims. The evidence before the trial court raised jurisdictional fact issues to be resolved by the fact finder as to whether BHA had timely notice of the condition of the real property, fault, and the claimed injuries of the plaintiffs. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.101. The pleading deficiencies are curable, and plaintiffs should be afforded an opportunity to amend their pleadings. *See Miranda*, 133 S.W.3d at 226–27.

Issue one is overruled.

## WAIVER OF IMMUNITY FOR PREMISES DEFECT

 BHA argues in its second issue that plaintiffs have no viable premises liability claims under section 101.021(2) of the Texas Civil Practice and Remedies Code. A plaintiff must plead facts sufficient to invoke a waiver of governmental immunity under the TTCA. *See County of Cameron*

*v. Brown*, 80 S.W.3d at 555; *Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 222 (Tex. App.-Fort Worth 2003, pet. denied). We consider the language of the TTCA and then determine whether the liability theories pleaded and the jurisdictional evidence presented demonstrate a claim falling within the TTCA's waiver of immunity. *See Univ. of N. Tex.*, 124 S.W.3d at 222.

Plaintiffs alleged that the following acts or omissions by BHA constituted negligence:

1) Exposing Plaintiffs to hazardous material, lead;
2) Failing to warn of the dangers of lead poisoning;
3) Failing to take proper safety precautions, including abatement;
4) Failing to warn of the hazards of lead exposure;
5) Failing to advise Plaintiffs of the symptoms and treatment of lead poisoning;
6) Failing to inspect the rental premises for lead based paint and/or materials prior to Plaintiff's habitation of said premises;
7) Breaching the warranty of habitability;
8) Failing to maintain the premises in which Plaintiffs were living; [and]
9) Failing to comply with the requirements of applicable building, housing, and health codes[.]

Plaintiffs argue BHA should have repaired the known hazardous defects.

■ BHA argues it did not breach any duty to plaintiffs to remedy the condition because BHA warned plaintiffs about the possible presence of lead-based paint on the premises, and the possible defect was not concealed. BHA also maintains that the lease agreements between the plaintiffs and BHA required the plaintiffs to immediately provide to management written notice of any need for repairs or any unsafe conditions on the premises which might lead to injury or damage, and that BHA had a duty to make repairs only on receipt of notice.

The TTCA permits suit against governmental units for personal injuries caused by, among other things, the condition of real property, "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1)-(2) (Vernon 2005), § 101.022 (Vernon Supp.2008); *Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex.App.-Dallas 2005, no pet.); *Lamar Univ. v. Doe*, 971 S.W.2d 191, 195 (Tex.App.-Beaumont 1998, no pet.). The TTCA also provides that when the condition of real property giving rise to the waiver of immunity is a premises defect, generally a governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property. TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(a). This limitation of duty under section 101.022 does not apply if the claimant pays for the use of the premises. *Id.*

■ Plaintiffs paid for the use of the apartments. The duty owed here is defined by the relationship of the parties as lessor and lessee, as it would be if the government unit were "a private person." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(2); *Davies*, 158 S.W.3d at 59. Generally, with certain exceptions, a lessor's liability for conditions on leased premises ends with transfer of possession and control to the tenant. *See id.* However, if the lessor has contracted to keep the leased property in repair, the lessor may be liable to the tenant, and possibly others on the property with the tenant's consent, for the failure to exercise reasonable care to complete the repair. *See*

*Shell Oil Co. v. Khan,* 138 S.W.3d 288, 297 (Tex.2004); *Harvey v. Seale,* 362 S.W.2d 310, 312 (Tex.1962); RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENANT § 17.5 (1977). Comment c to Restatement § 17.5 explains:

> The landlord's duty under the rule stated in this section is not merely contractual, although it is founded upon a contract. It is a tort duty. It extends to persons on the leased property with the consent of the tenant, with whom the landlord has made no contract.

*Id.,* cmt. c. This "tort duty arises from the lessor's ability to make repairs and his control over them[.]" *Harvey,* 362 S.W.2d at 312; *see also* RESTATEMENT (SECOND) OF TORTS § 357 (1965).

Section 9 of the lease agreements between the plaintiffs and BHA states:

> 9. DEFECTS HAZARDOUS TO LIFE, HEALTH AND SAFETY
>
> When conditions are created which are hazardous to life, health, safety, and welfare of the occupants, Resident shall immediately notify Management of the damage. Management shall be responsible for the repair of the unit within a reasonable amount of time....
>
> If repairs of the defects cannot be made within a reasonable amount of time, Management shall provide standard alternative accommodations, if available....

The provision gives rise to a tort duty to repair a condition hazardous to life, health, safety, and welfare of the occupants within a reasonable amount of time after BHA learns of the condition. The contractual requirement that the resident "immediately notify" management applies to the contractual obligation to repair or provide "standard alternative accommodations." The law does not require the resident to notify the obligated lessor, about a hazardous condition the lessor already knows about, before the tort duty will arise, however; the lessor who has agreed to repair a hazardous condition has a tort duty to exercise reasonable care to complete a repair of a known hazardous condition in a reasonable amount of time. This duty is different from the duty to disclose concealed dangers. We do not think the duty to complete a repair is satisfied by a disclosure of the hazard, because the duty arises as a result of the specific agreement to repair. *See generally Khan,* 138 S.W.3d at 297 (noting several duties a landlord owes with respect to premises turned over to tenants). In this case, the evidence raises a fact issue regarding whether BHA learned of a hazardous condition at the complexes in question before the alleged injuries occurred, and whether BHA exercised reasonable care to complete the repairs in a reasonable amount of time thereafter.

██ Relying on *Davies,* BHA argues that under section 392.006 of the Texas Local Government Code, BHA is protected from liability based on any failure to comply with the lease agreement. *See Davies,* 158 S.W.3d at 60. Section 392.006 provides the following:

> For all purposes, including the application of the Texas Tort Claims Act ..., a housing authority is a unit of government and the functions of a housing authority are essential governmental functions and not proprietary functions. Provided, however, a housing authority shall be subject to all landlord obligations and tenant remedies, other than a suit for personal injuries, as set forth in any lease or rental agreement and in Chapters 24, 54, 91, 92, and 301 of the Property Code.

TEX. LOC. GOV'T CODE ANN. § 392.006 (Vernon Supp.2008). Essentially, the section provides that in a suit against a housing

authority other than for personal injuries, the housing authority, despite its status as a governmental unit, is subject to the obligations and tenant remedies under the lease agreement and in Property Code Chapters 24, 54, 91, 92, and 301. *See id.* In other words, the fact that the housing authority is a unit of government exercising governmental functions does not protect the housing authority from those obligations, designated in Section 392.006, it has as a landlord. Section 392.006 makes clear, however, that in a suit against a housing authority for personal injuries, the provisions of the Texas Tort Claims Act control the housing authority's liability. The Texas Tort Claims Act waives immunity to suit for personal injuries caused by a condition of real property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2).

The cause of action here is not for contract damages or specific performance. Plaintiffs do not seek a contractual remedy governed by the lease or the Property Code, but a tort remedy provided a tenant under circumstances where the landlord has agreed to make repair, fails to exercise reasonable care to complete the repair, and damages result. *Compare Davies,* 158 S.W.3d at 60 ("Because Davies's suit is for personal injuries, we conclude that the legislature has not waived BHA's immunity from suit for any obligations BHA may have had under the lease agreement.").

BHA also relies on section 92.052 of the Property Code, and argues that its duty to repair is statutorily limited to making a diligent effort to repair a condition only after receiving written notice. *See* TEX.

PROP.CODE ANN. § 92.052 (Vernon Supp. 2008). The testimony of the adult plaintiffs indicates they did not provide written notice of peeling lead paint in their apartments before the injuries. However, section 92.052 does not apply to personal injury claims. *See Timberwalk Apts. v. Cain,* 972 S.W.2d 749, 755 (Tex.1998); *Moreno v. Brittany Square Assocs., L.P.,* 899 S.W.2d 261, 263 (Tex.App.-Houston [14th Dist.] 1995, writ denied).

■ BHA also contends that plaintiffs have no claims the warnings were inadequate because the Act does not waive immunity for a failure to act. BHA cites *Lamar University,* 971 S.W.2d at 196 and *City of Fort Worth v. Crockett,* 142 S.W.3d 550, 554 (Tex.App.-Fort Worth 2004, pet. denied). *Crockett* involved the recreational use statute and the limited duty owed to trespassers; this case does not involve the recreational use statute or the duty owed under that statute. *See Crockett,* 142 S.W.3d at 553–54. In *Lamar,* this Court held that "[f]ailure to use, failure to act, or non-use claims do not satisfy the use-of-property requirement" of section 101.021(2). *Lamar,* 971 S.W.2d at 196. Here, plaintiffs are tenants, and claim the lead-based paint existing at the complexes constituted a "dangerous condition ... that rendered the premises unsafe[.]" This is not a case concerning the non-use distinction for the "use" of property requirement at issue in *Lamar,* but instead involves a premises condition.[2]

■ BHA correctly asserts that plaintiffs have no viable claim for breach of the warranty of habitability, and the TTCA does not waive immunity to suit based on that claim. That is true because under Texas case-law a tenant has no personal

---

**2.** We do not address the merits of the inadequate warning claim. As we have noted, Texas law recognizes that a landlord has a duty to disclose concealed dangers. *See Shell Oil* *Co. v. Khan,* 138 S.W.3d 288, 297 (Tex.2004). The trial court has jurisdiction to dispose of that claim on the merits. *See* TEX. CIV. PRAC. & REM.CODE § 101.021(2).

injury claim against the lessor for breach of an implied warranty of habitability. *See Porter v. Lumbermen's Inv. Corp.,* 606 S.W.2d 715, 717 (Tex.Civ.App.-Austin 1980, no writ); *Craig v. Mixon,* No. 07–97–0350–CV, 1998 WL 466133, at *3, 1998 Tex.App. LEXIS 4888, at *13–14 (Tex.App.-Amarillo Aug. 11, 1998, pet. denied) (not designated for publication). Immunity to suit has not been waived for a claim for which a private lessor would not be liable as a matter of Texas law. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021(2); 101.025(a).

Issue two is overruled in part and sustained in part.

## PROXIMATE CAUSE

In its third issue, BHA argues the trial court erred in denying BHA's plea to the jurisdiction because the jurisdictional evidence was legally insufficient to show any injury proximately caused by exposure to lead-based paint at BHA-owned premises. Plaintiffs provided the trial court with an affidavit of Wayne R. Snodgrass, M.D., Ph.D. The affidavit concludes that, "to a reasonable degree of medical probability," the minor plaintiffs

1. were exposed to lead (Pb) resulting in elevated whole blood lead (Pb) levels;
2. most likely got their lead (Pb) exposure and absorbed dose of lead (Pb) from hand-to-mouth activity; and
3. may have had their lead (Pb) exposure from paint chips containing lead (Pb).

The affidavit further states the following are adverse effects of lead exposure in children:

1. an average decrease in I.Q. of about 5 points in children with an average whole blood lead (Pb) level of approximately 30 ug/dl when compared to other children with an average

whole blood lead (Pb) level of approximately 10 ug/dl;

2. a decrease in fine motor (muscle use) control in children with an average whole blood lead (Pb) level of approximately 30 ug/dl when compared to other young children with an average whole blood lead (Pb) level of approximately 10 ug/dl;
3. a trend toward prolongation of the nerve conduction time in cranial nerve VIII (auditory, i.e., hearing) in children with whole blood lead (Pb) levels in the range of approximately 25 to 30 ug/dl or more;
4. inhibition of a biochemical blood test, red blood cell ALAD (aminolevulinic acid dehydratase) activity, in children at whole blood lead (Pb) levels of approximately 15 to 20 ug/dl; [and]
5. an increased likelihood in children with elevated whole blood lead (Pb) levels of behavioral disorders and decreased school academic performance.

In addition, it is well known that at higher whole blood lead (Pb) levels, i.e., greater than 70 to 100 ug/dl, there is risk for encephalopathy, i.e., seizures and grossly obvious brain damage with subsequent mental retardation/spasticity.

 We do not reach the merits of the claims in this appeal. Plaintiff's pleadings assert BHA's fault caused injuries to the minor plaintiffs. Generally, unless the undisputed jurisdictional evidence establishes otherwise, we are to accept the plaintiffs' allegations as true in determining jurisdiction. *See Bland,* 34 S.W.3d at 554. Plaintiffs are not required "to put on their case simply to establish jurisdiction." *Id.* Furthermore, when material evidence concerning causation is disputed, the issue is one for the fact finder to resolve. *See*

*Ambrosio v. Carter's Shooting Ctr., Inc.,* 20 S.W.3d 262, 266 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *see also Miranda,* 133 S.W.3d at 227–28 ("If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder."). Considering plaintiffs' pleadings of causation and damages, and the disputed jurisdictional facts before the trial court, the trial court did not err in denying the plea to the jurisdiction.

Issue three is overruled.

The trial court's order denying the plea is affirmed.

AFFIRMED.