

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00056-CR

ROBERT JAMES FOX, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 2nd District Court
Cherokee County, Texas
Trial Court No. 17387

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

After Robert James Fox was convicted by a Cherokee County jury[1] of the state-jail felony of tampering with a governmental record, he was sentenced to be incarcerated for one year and fined $10,000.00. Finding the evidence legally insufficient to support the conviction, we reverse the judgment of the trial court and render a judgment of acquittal.

I.      Background

A native of Canada, Fox immigrated to Texas at the age of thirty and eventually came to stay with a friend, Dr. Barry Brooks, a dentist in Jacksonville, Texas, as Fox convalesced from illnesses. Brooks, however, was eventually incarcerated,[2] leaving Fox to occupy a building located at 300 South Main Street in Jacksonville. This building was controlled by a church group that called itself the "House of Israel."

When Fox recovered from some of his health problems, he and others from the House of Israel church began making plans to purchase a church building that belonged to a Methodist church in Jacksonville. The purchase was negotiated, and the closing was scheduled for April 30, 2008.

During Fox's association with the House of Israel, he and the church had managed to attain a status more of being locally infamous than being locally famous. Even before the sale of the local Methodist church's property took place, the Jacksonville Chief of Police, Reece Daniel,

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]Brooks was apparently incarcerated for practicing dentistry without a license.

2

expressed a certain mistrust of those involved with the House of Israel. In an article entitled "Subject to Law" that was published in the *Jacksonville Daily Progress* newspaper, Daniel referenced the House of Israel as being an offshoot of the "Republic of Texas," a group which has followers that believe in an anti-government, anti-authority dogma.

The sale of the Methodist church's property to the House of Israel was finalized as planned. Soon thereafter, the Jacksonville Police Department executed three search warrants for persons and/or property connected with the House of Israel. The initial warrant, executed May 15, 2008, was for the arrest of David Baugh, who was supposedly residing at 300 South Main Street and had an outstanding felony warrant from the State of Missouri.[3] The second search warrant, executed May 21, 2008, was for "prescription medications or other controlled substances, documents showing possible sales of medications or controlled substances or delivery of medications or controlled substances, and Robert James Fox . . . who is located at said suspected place to avoid apprehension and prosecution."[4] As a result of this second

---

[3]Baugh was taken into custody without incident. A newspaper report of the execution of the May 15, 2008, warrant described the matter a bit more dramatically: "A squad of Jacksonville Police Department officers, in full SWAT regalia, executed a search warrant Thursday evening at the local House of Israel building, resulting in the arrest of one state fugitive and the seizure of a large stash of illegal drugs." Officer Jason Price with the Jacksonville Police Department testified that in the process of executing this warrant, he smashed the front door of 300 South Main "to smithereens." The officer's return of warrant indicates the following drugs were seized: fourteen 500-ct. bottles of 500 mg Cephalexin; fifty-one fifteen-ct. 500 mg. Cephalexin packets; fourteen ten-ct. 500 mg. Cephalexin packets; four six-ct. 500 mg. acetaminophen packets; one nineteen-ct. 250 mg. Erythromycin packet; twenty-three twenty-ct. 250 mg Erythromycin packets; two 500-ct. bottles 250 mg Erythromycin; seven fifteen-ct. 500 mg Amoxicillin packets; one bottle LinderOint Orabase B; one 2mg Lorazepam tablet; one 266-ct bottle 500 mg Amoxicillin; and one 259-ct. bottle 500 mg. Cephalexin.

[4]This warrant was issued pursuant to the affidavit of Jacksonville police officer Daniel Franklin, who, upon executing the initial warrant for the person of Baugh, observed "over 10,000 pills of prescription medications and controlled substances" on the premises when the initial warrant for the person of Baugh was executed.

3

warrant, Fox was arrested for possession of illegal drugs. All charges stemming from this arrest were subsequently dismissed.[5]

The final warrant, issued June 9, 2008, sought "[c]omputer hardware, software or electronic storage media . . . [t]elecommunications devices or equipment . . . [p]apers or documents . . . [m]agazines, books, pictures, videos or periodicals," any of which may be evidence of violations of "Texas Penal Code 38.123 or other violations related to practicing law."[6] Two days later, Fox was arrested for practicing law without a license. At the time of trial in the instant case, the charges against Fox for the unauthorized practice of law remained pending in County Court.

Fox was arrested for a third time on December 3, 2008, on a charge of barratry.[7] The barratry charge was never taken to a grand jury or otherwise pursued. From May through December 2008, a total of nine charges were brought against Fox. None of these charges

---

[5]Judy Scott, who was present with Fox when this warrant was executed, testified that the building at 300 South Main has four postal designations. The officers did not enter the 209 entrance to the building, which was Fox's suite. Instead, they crashed in a door. As the police entered, the first thing Scott saw "was the wrong end of a pistol as it came around the corner into the room." Four or five officers entered the room and handcuffed Scott and Fox. As they exited the building, the media was present with video cameras, prepared and waiting. Scott and Fox were led out and were made to stand in full view of the cameras. The police searched Scott's belongings and her vehicle, although she was never shown a warrant. Although Scott was not arrested, Officer Price told her that if he found her in Cherokee County again, he would arrest her.

[6]The June 2008 warrant also sought "[r]ecords or other items which evidence ownership or use of computer equipment found in the above residence," as well as "records, documents, receipts, banking records, utility and telephone bills, mail envelopes or addressed correspondence or other indicia of ownership indicating possession, residence or control over the residence located at 300 S. Main, Jacksonville, Texas 75766."

[7]In executing this warrant, officers loaded a sixteen-foot trailer with computers, file cabinets and files. According to Fox, the place looked "like it had been put through a blender. . . . it was completely -- unbelievably devastated including even putting their combat boots through the ceiling just for spite."

4

resulted in a conviction.[8]  After this rather bizarre series of events, Fox resolved to sue the City

of Jacksonville under the Texas Tort Claims Act.

To this end, Fox created a document captioned, "CLAIM:  NOTICE TO CURE/NOTICE

OF INTENT TO SUE AS PRESENTED BY AFFIDAVIT OF Robert James Fox."[9]  The claim

asserts, among other things, that the Jacksonville Police Department commenced a "series of

attacks by force of arms" on three separate occasions.  Fox further claims his December 3 arrest

and the events leading up to it were the result of retaliation, discrimination, religious persecution,

and included torture.[10]

Fox filed his notice among the miscellaneous documents in the County Clerk's Office of

Smith County on January 6, 2009.[11]  Once filed, a copy of the document became a part of the

records of the County Clerk of Smith County.  After filing the notice in Smith County, Fox

---

[8]The May 3, 2009, edition of the *Jacksonville Daily Progress* quoted Jacksonville Mayor Robert Haberle as stating that "apathy on the part of prosecutors could result in Jacksonville becoming a safe haven for the members of the House of Israel and their ilk."  Haberle further opined that the people of Jacksonville "don't want this fringe group to be able to make Jacksonville a hub for their operations."  At some point, Chief Daniel shook his finger at Fox and declared that he (Daniel) was going to call Homeland Security and Immigration.  Although Fox was interviewed by an immigration officer, the officer did not place a hold on Fox.

[9]This notice (and many pleadings filed by Fox) began with the following paragraph:

> I, Robert James Fox, am a sovereign, sui juris, free white man, a follower of Yahshua the Messiah in the laws of The Almighty Supreme Creator, Yahvah first and foremost and the laws of man when they are not in conflict (Leviticus 18:3, 4).  Pursuant to Matthew 5:33-37 and James 5:12, let my yea be yea, and my nay be nay, as supported by your Federal Public Law 97-280, 96 Stat. 1211.  I have personal knowledge of the matters stated herein, am over the age of majority, and hereby asseverate understanding the liabilities presented in Briscoe v LaHue, 460 US 325.

[10]Jacksonville police officers fingerprinted Fox in connection with one of his arrests.  Officer David Gayler testified that Fox objected to being fingerprinted.  Gayler and Price applied wrist locks to Fox in order to obtain his prints. Fox screamed when the wrist locks were applied, and Gayler stopped.

[11]Although Jacksonville is located in Cherokee County, Fox explained that he did not file the notice with the County Clerk of Cherokee County because the clerk did not have a miscellaneous file, and the notice was a miscellaneous file issue.

delivered the notice to Betty Thompson, the City Secretary for Jacksonville. After stamping the notice as "received" by the City of Jacksonville, Thompson delivered the notice to the city manager, the city attorney, and the human resources director for the City of Jacksonville. The city manager delivered the notice to Daniel.

On January 23, 2009, Fox was arrested for tampering with a governmental document. The indictment alleged that Fox presented or used a governmental record, i.e., the notice filed with the County Clerk of Smith County, by presenting the notice to the City of Jacksonville, with the intent to harm or defraud the City, with knowledge of its falsity as the document purported "to be a complaint, summons, or other Court Process and/or claiming retaliation and/or discrimination and/or religious persecution and/or torture."[12]   After a jury trial at which Fox represented himself with standby counsel available, Fox was found guilty of tampering with a governmental record. Fox claims, among other things, that the evidence is insufficient to support his conviction. We agree.

## II.   The Evidence is Insufficient to Support the Conviction

In reviewing a challenge to the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of tampering with a governmental record beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.

---

[12]The indictment is dated February 19, 2010.

6

Crim. App. 2007)). We give deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A person commits the offense of tampering with a governmental record if such person "makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record." TEX. PENAL CODE ANN. § 37.10(a)(2) (West Supp. 2013). Committing the offense with intent to defraud or harm another increases the penalty range for the offense. TEX. PENAL CODE ANN. § 37.10(c) (West Supp. 2013).[13] The

---

[13]Here, the jury was instructed,

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 6th day of January, 2009, in Cherokee County, Texas, the defendant, Robert James Fox, did then and there with intent to defraud or harm The City of Jacksonville, Texas, did then and there intentionally or knowingly present or use a governmental record, or present, or use a record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record, by presenting or using a document filed with Smith County Clerk and styled "Attn: Risk Management Claim: Notice to Cure/Notice of Intent to Sue as presented by affidavit of Robert James Fox", by presenting said document to employees of the City of Jacksonville, Texas, with knowledge of its falsity to-wit: claiming retaliation and/or discrimination and/or religious persecution and/or torture, then you will find the defendant Guilty of Tampering with a Governmental Record, as charged in the indictment.

elements of proof for the charged offense are that (1) a person (2) makes, presents, or uses (3) a governmental record (4) with knowledge of its falsity, (5) with the intent that it be taken as a genuine governmental record, and (6) with intent to defraud or harm another. TEX. PENAL CODE ANN. § 37.10(a)(2), (a)(5), (c)(1) (West Supp. 2013).

### A.  Is the Notice a Governmental Record?

It is undisputed that Fox created the notice and presented it to the City of Jacksonville. We must, therefore, initially determine whether the notice, which was filed in the County Clerk's Office of Smith County, is a governmental record.

Section 37.01(2) defines a governmental record as:

> (A)  anything belonging to, received by, or kept by government for information, including a court record;
>
> (B)  anything required by law to be kept by others for information of government;
>
> (C)  a license, certificate, permit, seal, title, letter of patent, or similar document issued by government, by another state, or by the United States;
>
> (D)  a standard proof of motor vehicle liability insurance form . . . ; [or]
>
> (E)  an official ballot or other election record. . . .

TEX. PENAL CODE ANN. § 37.01(2) (West Supp. 2013). "Government" is defined under the Texas Penal Code as "the state; . . . a county, municipality, or political subdivision of the state; or . . . any branch or agency of the state, a county, municipality, or political subdivision." TEX. PENAL CODE ANN. § 1.07(a)(24) (West Supp. 2013).

---

The charge instructed as well to the lesser-included offense of tampering with a governmental record if, "(1) the person makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record or (2) makes, presents, or uses a governmental record with knowledge of its falsity."

In its indictment, the State emphasized the fact that the notice of claim that Fox delivered to the City of Jacksonville had first been filed for record with the County Clerk of Smith County. This same fact was also stressed in the brief filed by the State. The apparent reason for this emphasis and stress was for the purpose of showing that the notice of claim had become a governmental record. Showing that the document is a governmental record is vitally important because unless this is shown, there would have been no basis for the filing of a criminal charge.

In this case, however, it is not necessary for us to address whether the filing of the notice with the County Clerk of Smith County transformed the notice into a governmental record under the appropriate statute because another action on Fox's part achieved that end. Here, the delivery of the notice to the City Secretary of Jacksonville shifted the notice into the category of a governmental record. Fox's notice explicitly states that it is filed pursuant to Section 106.001 of the Texas Civil Practice and Remedies Code and expresses an intent to sue: "The CITY OF JACKSONVILLE is hereby and herein given due process notice and opportunity to pay the CLAIM within thirty days of receipt of this notice as to damages inflicted OR the CITY OF JACKSONVILLE will force me to pursue other legal avenues."

The pre-suit notice requirement of the Texas Tort Claims Act requires potential claimants to provide proper notice to governmental entities to assure prompt reporting of claims, to allow governmental units to gather information necessary to guard against unfounded claims, and to enable settlement or preparation for trial. *Housing Auth. of City of Beaumont v. Landrio*, 269 S.W.3d 735, 741–42 (Tex. App.—Beaumont 2008, pet. denied). The statute provides,

9

(a)   A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred.  The notice must reasonably describe:

(1)   the damage or injury claimed;

(2)   the time and place of the incident; and

(3)   the incident.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.101(a) (West 2011).  Under this section, Fox was required to deliver his notice of claim to the City of Jacksonville prior to filing a lawsuit against it.  The term "government," as used in the Texas Penal Code, includes a municipality or political subdivision of the State, a category into which the City of Jacksonville falls.  *See* TEX. PENAL CODE ANN. § 1.07(a)(24).  As previously discussed, a governmental record is "anything belonging to, received by, or kept by government for information, including a court record." TEX. PENAL CODE ANN. § 37.01(2)(A).  Here, the notice was delivered to the secretary for the City of Jacksonville.  It, therefore, became a record "received by the government."  And, this record was indeed received by the government for information.  The City was statutorily entitled to the information in the notice so that it could investigate the claim, settle the matter, or prepare for trial, among other things.  *See Landrio*, 269 S.W.3d at 741–42.  As such, the notice became a governmental record when it was delivered to the secretary for the City of Jacksonville.  *See Morales v. State*, 11 S.W.3d 460, 462 (Tex. App.—El Paso 2000, pet. ref'd) (petition containing signatures for placement on ballot became governmental record after it was accepted by party chairperson).

**B.      Did Fox Present the Notice With Knowledge of its Falsity?**

The State contends that the false statements included in the notice were statements that the search warrants executed at the House of Israel and Fox's subsequent arrests (including the December 3, 2008, arrest) were matters of "RETALIATION, DISCRIMINATION, RELIGIOUS PERSECUTION," and included torture.  The jury was instructed that if Fox presented the notice to employees of the City of Jacksonville with knowledge of its falsity (listing false statements as retaliation and/or discrimination and/or religious persecution and/or torture), they were to find Fox guilty of tampering with a governmental record.[14]

In *Vasilas*, the Texas Court of Criminal Appeals determined that a false assertion of fact in a petition for expunction could expose the attorney filing it to criminal charges.  *State v. Vasilas*, 187 S.W.3d 486, 491–92 (Tex. Crim. App. 2006).  It is axiomatic that the inclusion of an objectively verifiable false statement of fact in a pleading is known (or should have been known) by the writer to be false.  Implicit in a determination that such a factual statement is false is the writer's knowledge of the falsity.  Here, we are presented with allegedly false statements which cannot be classified as objectively verifiable statements of fact.  Rather, the statements at issue are the writer's conclusions or opinions, based on a certain set of factual circumstances. *Vasilas* was careful to point out that a violation of Section 37.10(a)(5) (to make, present, or use a governmental record with knowledge of its falsity) is very different from statements "advancing different legal theories which have bases in the facts and the law." *Id.* at 491.  The former may result in criminal prosecution, while the latter is mere advocacy. *See id.*  Fox's notice in this

___

[14]The charge also instructed that Fox must have presented the notice to the City of Jacksonville with the intent to defraud or harm the City of Jacksonville and with the intent that it be taken as a genuine governmental record.

case falls within the category of advocacy. Fox informed the City of Jacksonville that the actions of the Jacksonville Police Department in May, June, and December 2008 were precipitated by "RETALIATION, DISCRIMINATION, AND RELIGIOUS PERSECUTION." He further claimed that "[a]ll of the above matters caused me extreme emotional distress which was inflicted intentionally in the nature of TORTURE." The State claims that Fox knew these statements were false.

The State points to testimony from Mayor Haberle, Officer Gayler, Justice of the Peace Pete Menefee, County Court at Law Judge Craig Fletcher, and Belinda Simms, who witnessed one of Fox's arrests.

Haberle testified that he had no knowledge of any discrimination, retaliation, religious persecution, or torture against Fox. Gayler testified that Fox was not discriminated against in obtaining his fingerprints, that there was no religious persecution in obtaining Fox's fingerprints, and that Fox had not been tortured. Menefee testified by deposition that there was no discrimination against Fox in setting the amount of the bond for the various crimes with which he was charged, that there was no retaliation against Fox for anything he had done, that Fox was never tortured, and (from Menefee's standpoint) that Fox had been treated in the same fashion as anyone else. Fletcher (the magistrate who issued the search warrants) testified that the search warrants he issued were based on affidavits presented to him in support of those warrants (which were not fatally flawed due to typographical errors or references to the wrong statutes) and that, as a neutral and detached magistrate, it is his duty to determine whether probable cause exists to issue the warrant, not whether the supporting affidavit is perfect. Simms testified that Fox's

12

place of business was across the street from her place of employment, and she related the events that took place on the day of Fox's arrest, emphasizing that the police escorted Fox out of the building "very nicely," that she saw no evidence of Fox being tortured or injured, and that he appeared to be treated no differently from any other person she has seen arrested.

At most, the foregoing testimony supports the proposition that these witnesses disagree with Fox's allegations. This testimony does not, however, get at the root of the issue—Fox's knowledge that the claims were false. Stated differently, the State was required to prove not only that the specific allegations of discrimination, retaliation, religious persecution, and torture were false, but that Fox was aware that they were false. In this task, the State failed.

Relevant to Fox's knowledge that the claim of torture was false was Fox's testimony that at no time was he hit, kicked, subjected to cattle prods, physical injury, or water boarding.[15] Fox's claim of torture, as stated in the notice, was "extreme emotional distress." The notice did not state that the alleged torture resulted from physical abuse. While physical abuse can result in extreme emotional distress, it is not the only method by which such distress may be inflicted.

Relevant to Fox's knowledge of the falsity of his claims for religious persecution and discrimination was his testimony that he was unaware of any other churches in the Jacksonville area (1) in which two individuals were detained, one of whom was picked up by federal authorities for firearms violations, (2) in which a fugitive from the State of Missouri resided, (3) in which an unlicensed dentist performed services on premises, and who was tried and

_____

[15]Fox testified that, having read that the "Torture Statute" had to do with mental pain or anguish, his claim that the torture referenced in his notice was mental anguish over the course of events was due to his arrest and detention in solitary confinement for 146 days in the Cherokee County jail. He also based the torture claim on physical pain resulting from the wrist locks employed in order to obtain his fingerprints.

convicted for that crime, and (4) in which law enforcement served a search warrant looking for material relevant to the unlicensed practice of law.

The State introduced a booklet into evidence called *Knowledge is Power*, drafted and/or compiled by Fox, consisting of materials used for a seminar Fox conducted in Las Vegas several years ago. The binder includes a section on the power of affidavits, habeas corpus, and lawsuits. The State relies on Fox's own testimony and the contents of that booklet to show Fox knew his claims of retaliation, religious persecution, discrimination, and torture were false. However, nothing in this binder of seminar materials touches on the issue of whether Fox had knowledge that his notice contained false information.

In questioning Fox about the Las Vegas lecture, the State asked Fox if he discussed "legal proceedings or things people could do claiming discrimination, religious persecution and torture." Fox responded, "Well, those are things that happened to people." Although this appears to be something of a tacit admission that Fox did, indeed, discuss these topics during a lecture at some point, this type of testimony does not tend to prove that Fox knew the claims set forth in the notice in *this* case were false.

The foregoing evidence is insufficient to prove Fox knew the allegations of discrimination, religious persecution, retaliation, and torture were false. Fox's allegations are merely that—allegations—to be accepted or rejected in a civil proceeding.

Further, the State alleged in its indictment that Fox presented the notice of claim "with intent that it be taken as a genuine governmental record, by presenting or using a document filed with the Smith County Clerk . . . ." In its case, the State produced no evidence that Fox had the

14

intention that the claim be taken as a genuine governmental record due to its previous filing in Smith County. In contravention of that charge, Fox himself presented a somewhat paranoid explanation for causing it to be filed—he wanted it to be copied by some credible agency so he could prove its original content if someone subsequently altered it.

Because the State failed to prove that Fox presented his notice to the City Secretary of Jacksonville with knowledge of its falsity or with the intention that it be relied upon as a government document, the evidence is insufficient to support the conviction.[16]

## III.    Conclusion

We reverse Fox's conviction for tampering with a governmental document and render a judgment of acquittal.

Bailey C. Moseley
Justice

Date Submitted:     November 13, 2013
Date Decided:      December 4, 2013

Publish

---

[16]Fox raises several additional points of error: (1) the trial court erred in failing to set a hearing on Fox's motion for new trial, (2) the trial court erred in failing to grant Fox's request for a directed verdict based on Section 37.10(f), (3) the trial court erred in excluding the testimony of Eddie Craig, (4) the trial court erred in excluding the testimony of Brady Byrum, and (5) the trial court erred in failing to find Section 37.10(a)(5) unconstitutional. Because the evidence is insufficient to support the verdict, we need not address these additional points of error.

15