COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | No. 08-07-00354-CV |
| | § | |
| IN THE INTEREST OF D.J.R., E.N.R., | § | Appeal from |
| and A.D.R., MINOR CHILDREN. | § | 65th District Court |
| | § | of El Paso County, Texas |
| | § | (TC # 2006CM4085) |
| | § | |

## OPINION ON MOTION FOR REHEARING

We issued our original opinion on January 6, 2010. In the following days, a tsunami of public interest has flooded this community and our opinion has been swept along with the current. D.R. has filed a motion for rehearing asking us to revisit the expert qualifications of Dr. Paul Shrode, the El Paso County Medical Examiner, "in light of recent public inquiries into the extent and veracity of Dr. Shrode's stated professional qualifications." We begin with the simple observation that the issues surrounding Dr. Shrode now are not the same issues which were presented to the trial judge, the Honorable Alfredo Chavez, when this case was tried.[1]

### PROCEDURAL POSTURE AT TIME OF TRIAL

The underlying proceeding began in June 2006 when the Texas Department of Protective and Regulatory Services filed an original petition for protection of a child, for conservatorship, and for

---

[1] D.R. concedes that "[t]o be sure, an appellate court is bound by the record on appeal . . ." but he argues that recently "critical information and vigorous, far-reaching debate has arisen in the public forum which discounts and even negates Dr. Shrode's trial testimony and, by extension, calls into question this court's positive appraisal of his expert qualifications, an appraisal that forms the basis of the court's opinion."

termination of parental rights. The future of four children was at stake. A.S. is the mother of four children: A.R.D., born September 15, 2001; D.J.R., born August 13, 2004; and twin girls E.N.R. and A.D.R., born September 5, 2006. She was also the mother of D.R. who died on March 15, 2006 at the age of seven months. The adjudicated father of A.R.D. is J.D. D.R. was the father of the infant decedent[2] and he is the father of D.J.R., E.N.R., and A.D.R. The parental rights of A.S., J.D., and D.R. have all been terminated. Only D.R. is a party to this appeal. Bruce Yetter and Richard Deck, Assistant County Attorneys, signed the pleadings and represented the Department through trial. D.R. was represented by Christopher Cox while A.S. was represented by Theresa Caballero. As required by the Texas Family Code, the trial court appointed Bernardo Gonzalez and Celia Villasenor as attorneys ad litem to represent the interests of the children. Gonzales represented A.R.D.; Villasenor represented D.R.'s children.

## THE CHALLENGES TO DR. SHRODE

As the El Paso County Medical Examiner, Dr. Shrode conducted the autopsy of the infant D.R. Yetter called him as a witness on behalf of the Department. To clarify our initial opinion, we quote his testimony at length:

DIRECT EXAMINATION

(By Mr. Yetter): Good afternoon, Dr. Shrode. Please state your name completely for the record.

(Dr. Shrode): Paul Shrode.

Q: How are you employed, sir?

A: I'm the chief medical examiner for El Paso County.

[Permission to approach the witness granted]

---

[2] As we noted in our original opinion, D.R. was arrested and charged with capital murder in connection with the child's death.

Q:  Doctor, how long have you been employed as a chief medical examiner?

A:  A little over a year and a-half.

Q:  And what is your total experience as a forensic pathologist?

A:  Approximately ten years.

Q:  And what is your education?

A:  I got a medical degree from Texas Tech University. I got training in pathology during my residency. I was especially trained in forensic pathology and I worked for approximately seven years in Harris County as a medical examiner. From there I went to Lubbock for a couple of years and then here.

Q:  All right. Doctor, I've placed in front of you an Exhibit 12-A which is your credentials, I believe.

A:  Yes.

Q:  And are they current as of today?

A:  Yes.

Q:  And your testimony here today is expected to be in your area of expertise?

A:  Yes.

At this point, Yetter offered Dr. Shrode as an expert witness and offered Exhibit 12-A into evidence.

Both Cox and Caballero objected to the lack of a proper predicate, whereupon Yetter continued:

Q:  What exactly are your duties as the forensic pathologist?

A:  Well, principally [it] is to determine a cause around a manner of death in every case that falls in our jurisdiction.

Q:  And what is your authority or the scope if your authority insofar as all cases involving death?

A:  Well, as per the Texas Code of Criminal Procedure, we have that authority. I believe it's 49.25.

Q:  And as the chief medical examiner for El Paso County, do you supervise or do you actually perform the autopsies and the investigation?

A:     Well, about half of the autopsies I perform.  There's another pathologist in our office who would do the other half.

Q:     Is forensic pathology a recognized specialty in the field of medicine?

A:     Yes.

Q:     And is there an accepted level or an accepted curriculum for training that your have to undergo in order to achieve that specialty?

A:     Yes, sir.

Q:     And would you describe for the ladies and gentlemen of the jury some of the types of training and education that you go through in order to become a forensic pathologist?

A:     Well, after the residency in pathology which is just essentially a study of diseases, you are selected to a sub specialty field of training.  In this instance, forensic pathology, in which you learn the techniques for determining the causes of death and attaining a manner of death.  Generally there's at least a year training, sometimes it's two, depends on the institution.  I did my training in Cincinnati for a year.

Q:     Besides your medical degree that you've already testified to as coming from Texas Tech, what other credentials or certifications have you obtained?

A:     Of course we have to have a license to practice medicine in the State of Texas and I have that.  **I passed my forensic pathology boards which is an exam which is published by the American Board of Pathology.**

       **I'm also eligible for certification in what's called surgical pathology in which you look at breast biopsies and pap smears and that sort of thing. But the State of Texas requires that you need a license to practice and that you have that training in forensic pathology to be a medical examiner.**  [Emphasis added].

Let us pause here briefly.  From this testimony, the trial court could reasonably infer that Dr. Shrode was board certified in forensic pathology.  He had passed his board exams; he was *also* eligible for board certification in surgical pathology.  In other words, the trial court could either infer that he was eligible for board certification in both forensic and surgical pathology, or that he was already board certified in forensic pathology and was eligible for certification in surgical pathology.  It is within

the province of the fact finder to consider the evidence and the reasonable inferences that may be drawn therefrom. *Texas Tech University Health Sciences Center v. Lucero,* 234 S.W.3d 158, 167 (Tex.App.--El Paso 2007, pet. denied). We continue with Dr. Shrode's direct examination.

Q: Is the certification of a medical examiner licensed by the State of Texas?

A: Yes.

Q: Are there any other special trainings that you go to as a normal course of your medical license or pathology license?

A: Well, of course there are all sorts of conferences and things which we can attend which may be directed at particular points of forensic pathology, accidents, suicides, homicides, that sort of thing when we have time.

Q: Are you required under your medical licensing in the State of Texas to obtain continuing medical education?

A: Yes, sir. Every two years we have to perform a certain number of CMEs. They are called continuing medical education credits towards that license.

Q: **And are you required similarly [sic] the same type of continuing medical education for your forensic pathology certification?**

A: **No, sir. Because it's not required, we don't.** It's just the license in Texas. [Emphasis added].

Once again, this exchange infers that Dr. Shrode is board certified in forensic pathology. In response to a question couched in terms of "your forensic pathology certification," Dr. Shrode answered using the first person pronoun, "we." "We," i.e. "those of us who are board certified in forensic pathology," do not earn continuing medical education credits for forensic pathology "because it is not required." These inferences led to our misstatement in our initial opinion that Dr. Shrode was indeed board certified. He was not, and we regret the error. We now continue with Yetter's direct examination of Dr. Shrode.

Q: I notice that you had a pathology residency from 1991 to 1996 in Temple, Texas?

A:      Yes, sir, Scott & White Hospital.

Q:      And that was after you were a licensed physician?

A:      Yes, sir.

Q:      And then the forensic pathology fellowship for one year was after that?

A:      Yes, sir.

Q:      Since 1997, have you had any further educational training or experience?

A:      Nothing other than just experience of being in forensic pathology.

Q:      In the field of forensic pathology, is there an accepted manner of practice that physicians use in arriving at their conclusions, investigating the cause of death?

A:      Yes, I believe there is a general approach to that.  Yes.

Q:      And is that the approach that you use in your analysis?

A:      Yes, I try.

Q;      Is it an exact science?

A:      Not an exact science like you would consider mathematics, no.

Q:      Is there some involvement of judgment?

A:      Yes.

Q:      And is that based on experience and training?

A:      Yes.

Q:      Did you perform the autopsy on [D.R.]?

A:      Yes.

Yetter reoffered Dr. Shrode as an expert witness.  Cox took the witness on voir dire outside the

presence of the jury and questioned him concerning the reliability of the methodology he employed.

Caballero then cross-examined Dr. Shrode on his credentials, particularly the representation on his

*curriculum vitae* that he had a "[g]raduate law degree from school of political science."

[By Ms. Caballero]:   I see that you are a member of the State Bar of Texas from '79 to '83?

[Dr. Shrode]:          Yeah, but don't hold that against me.

Q:     I am not aware of a law school at Southwest Texas?

A:     There isn't.

Q:     Can you explain that, out of curiosity?

A:     Yes. When I, about, this was in '84, '85, okay. In 1979 Southwest Texas State University at the time was on a provisional course to get, go to law school. So their first class was us.

Q:     Okay.

A:     And as it turns out they did not get the full status for a law school. So, it was under the auspices of the political science department that we did that. So, the program became a paralegal program.

       And when I graduated from that six month or year study, I had a paralegal license, but no law license. So I went to work with the Legal Aide Society as a paralegal and we had to become members of the State Bar to do that, to be a paralegal with the Legal Aide Society of central Texas.

Q:     So when you say you were a member of the State Bar of Texas, you were not a member as a lawyer?

A:     I was a member as a paralegal, a legal assistant.

Q:     And it was a year study?

A:     Yes.

Q:     So you got a law degree or you got a paralegal degree?

A:     It was a paralegal degree. It was in the graduate school. They set it up through the graduate school, political science.

Q:     So would you say that was a graduate law degree or a graduate paralegal degree?

A: Well, it started out as a law degree and since it was from the graduate department, I mean I don't -- if that is not correct, then that can be changed. I don't know, I was under the impression it was a law degree from the political science school.

Q: Do you have a diploma that says you have a law degree?

A: No.

Q: So where did you get that impression that you have a law degree?

A: Well, [the *curriculum vitae*] doesn't say it is a law degree, does it? It says --

Q: Graduate law degree from school of political science.

A: Well, it is a degree in law from the school of political science.

Dr. Shrode was then questioned on his policy of treating every child death as a homicide until proven otherwise. After Caballero passed the witness, Judge Chavez questioned Dr. Shrode as to whether he had published any articles and, if so, in which journals.[3] He also inquired whether Dr. Shrode had testified as an expert in the district courts of El Paso County.[4]

Both Cox and Caballero lodged objections to Dr. Shrode's qualifications as an expert, his dishonesty with his legal credentials, his credibility, the reliability of his theory of child deaths, and whether that is an accepted practice in the medical community. Yetter then advised the court that the issue of the law license had nothing to do with Dr. Shrode's medical license and forensic pathology background. He believed Dr. Shrode had the requisite training. A.R.D.'s attorney ad litem then offered his opinion:

[By Mr. Gonzalez]: This isn't very complicated, Judge. Mr. Cox is correct when

---

[3] Dr. Shrode testified that "[t]here have been a few articles and I can't tell you how much, two or three, along the lines of toxicology." These were published in one or two toxicology journals.

[4] He had testified in five or six criminal cases in El Paso County and approximately 200 times in Harris County. He later testified that he had conducted more than 4,000 autopsies and external examinations.

he mentioned Daubert Robinson.[5] Daubert Robinson gives us all the information we need in this case. Daubert Robinson says that it has to be within the field of his expertise. He can't be telling us about why plastics tear. That's not within the field of his expertise. He is a pathologist.

And number two, it has to be based on established techniques and literature. He has said that. If you will remember his answers very carefully, Judge, he says well, these are the techniques that I was taught in my residency. The literature says, the literature says, the literature says. He said that about three or four different times. That's all Daubert Robinson requires, so I think that is clearly met. This is what pathologists do. This is what a pathologist testifies to. That is clearly within Daubert Robinson.

\* \* \* \* \*

He's very honestly saying there are some disagreements in the field, however the literature is telling us that these types of injuries can be diagnosed as non-accidental trauma.

Judge Chavez accepted him as an expert witness, and Dr. Shrode testified for the remainder of the day. He resumed his testimony the following morning and was questioned by Gonzalez:

[By Mr. Gonzalez]: I have only one more question regarding your CV sir, and the only thing I care about. **Are you Board Certified in the field of forensic pathology, sir?**

[Dr. Shrode]:    **Not yet.**

Q: **Are you on your way to becoming Board Certified in the field of forensic pathology?**

A: **Yes.**

Q: **And would you explain to the jury please what becoming Board Certified means?**

A: **In the forensic pathology the governing body that grants board certification requires two boards, one board in surgical pathology and another board in forensic pathology. I have taken and passed the forensic pathology portion. As I mentioned yesterday, I am eligible to take the anatomic portion. And until I do that, they do not award Board**

---

[5] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

> **Certification. There is apparently a division in the board of pathology that may split and they will be separate at some time, but until then.**
>
> **Q:    And you're working on that Board Certification in the meantime, is that correct?**
>
> **A:    That's correct.**  [Emphasis added].

This is the first time Dr. Shrode directly addressed board certification. Cox and Caballero both subjected him to recross examination but neither addressed the subject of board certification. Nor did they renew their challenges to his qualifications based on this later testimony. While they attacked Dr. Shrode's credibility, credibility goes to the weight rather than the admissibility of the evidence. *Olympic Arms, Inc. v. Green,* 176 S.W.3d 567,585 (Tex.App.--Houston [1st Dist.] 2004, no pet.)(jury is to assess the weight and credibility of an expert's proffered testimony), *citing Robinson*, 923 S.W.2d at 558 (there is a difference between the reliability of the underlying theory or technique and the credibility of the witness who proposes to testify about it.).

### STATUTORY QUALIFICATIONS OF A MEDICAL EXAMINER

The Texas Code of Criminal Procedure establishes the minimum qualifications of a medical examiner:

> The commissioners court shall appoint the medical examiner, who shall serve at the pleasure of the commissioners court. No person shall be appointed medical examiner unless he is a physician licensed by the State Board of Medical Examiners. To the greatest extent possible, the medical examiner shall be appointed from persons having training and experience in pathology, toxicology, histology and other medico-legal sciences. . . ."

TEX.CODE CRIM.PROC.ANN. art. 49.25 § 2 (Vernon 2006). Thus, regardless of whether Dr. Shrode was board certified in forensic pathology, he possessed the requisite qualifications to serve as the county medical examiner. Whether board certification should be added to the minimum qualifications is a matter we leave to the discretion of the Legislature.

**D.R.'S MOTION VIS-A-VIS RECENT EVENTS**

Local media publications in recent weeks have reported that the American Board of Pathology notified Shrode on October 28, 2003 that he did not pass all parts of the exams required for board certification. In 2008, the same board purportedly advised that he is no longer board-eligible. Of course, that is not part of the record before us. With limited exceptions not relevant here, an appellate court may not consider matters outside the appellate record. *Siefkas v. Siefkas*, 902 S.W.2d 72, 74 (Tex.App.--El Paso 1995, no writ), *citing Sabine Offshore Service v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex. 1979). The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record. TEX.R.APP.P. 34.1. And certainly, all of the attorneys could have inquired during the 2007 trial whether Dr. Shrode had taken the surgical pathology exam. While we understand the outrage over what may be considered disengenuous statements in light of current events, the appellate spotlight focuses on events developed at trial, not on speculation two years hence.

**APPLICATION OF THE APPROPRIATE STANDARD OF REVIEW**

Finally, we address D.R's comment that our "positive appraisal" of Dr. Shrode's expert qualifications "forms the basis of the court's opinion." We respectfully disagree as this statement disregards the applicable standard of review. The question is not whether members of this court believe that Dr. Shrode was qualified to testify as an expert. As we noted in our earlier opinion, the question is whether Judge Chavez abused his discretion in finding Dr. Shrode to be an expert. D.R. also complains that despite the doctor's "questionable methods of imprecise analytical skills," we believed "he was a qualified expert based on only two overriding criteria: his medical degree and his certification as a forensic pathologist." Again, this misstates the issue. The issue is whether Judge Chavez abused his discretion in finding Dr. Shrode to be an expert based on his medical

license, his years of training in forensic pathology, his experience as a medical examiner, and the numerous autopsies he has performed. And yes, Judge Chavez could have reasonably inferred at the time he ruled upon the objections that Dr. Shrode was board certified. He was not asked to reconsider his ruling when the doctor acknowledged he was not certified, and Judge Chavez heard uncontradicted evidence that certification is not statutorily required. We persist in our holding that no abuse of discretion has been presented. *Robinson,* 923 S.W.2d at 558 ("The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles."). With these comments and clarification, we deny the motion for rehearing.

February 17, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.